**People of the State of Illinois, Appellee, v. Paul Durant, Appellant.**

Gen. No. 51,924.

First District, Second Division.

January 28, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (George L. Lincoln and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Robert B. Rosen, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

Paul Durant, defendant, was indicted for the crimes of robbery and aggravated battery. He was tried before a jury which returned a verdict of guilty, and the defendant was sentenced to a term of five to ten years in the Illinois penitentiary, the sentence on each count of the indictment to run concurrently.

In this court the defendant complains that he was not properly identified; therefore, was not proved guilty be-

yond all reasonable doubt; that irrelevant evidence was introduced; that the prosecutor's arguments were improper; and that the defendant was denied a fair and impartial jury. (The defendant offered no evidence whatsoever in the case.)

There is no question that the complainant, Frank Wilkes, had parked his truck on Homer Street, four feet west of Damen Avenue, in the City of Chicago; that he was attacked by two men and a woman, and suffered head injuries, broken ribs and bruises; and that his wallet was taken, with two fives and a one-dollar bill removed from it. Shortly after the crime Officer Victor Hoffman arrested the defendant and James Catalano in an alley east of Damen and 100 feet south of Homer Street, where they were seen at a "T" in the alley, coming from the north and turning west. Defendant's shirt was out and his pants were unzipped. Catalano was carrying one ten-dollar bill and two singles; defendant carried no money.

Dr. William Haines, a psychiatrist, had examined the defendant three months before the trial and reported he was competent to stand trial. The report indicated that the defendant had been in Elgin State Hospital a few months for observation, and had previously been in the hospital from October 24, 1962 to January 24, 1963; the defendant was described as "emotionally unstable."

On July 5, 1966, a sanity hearing regarding the defendant was held before a jury. At that hearing Dr. Haines testified that he had examined the defendant on June 6 and found that the defendant understood the nature of the charges against him and was able to cooperate with his attorney. The jury returned a verdict finding the defendant competent to stand trial.

When the defendant was brought into the courtroom he was struggling with two deputy sheriffs. The trial judge excused the prospective jurors and asked the defendant if he wished to be present at the trial proceeding.

The defendant began mumbling and crying, and said, "Leave me alone." The court then held that defendant had waived his right to be present and ordered him removed from the courtroom until he decided to conduct himself properly. The court noted then that the defendant had behaved normally on prior court dates and during the morning in question; that there had never been any outbursts.

The jury was selected from the panel which had observed defendant's outburst, and the court told the jury that the defendant did not choose to attend the proceedings and was in custody. The jury was carefully examined both by counsel and the court as to whether or not the defendant's conduct in the courtroom would have any effect on their verdict, and the only jurors selected were those who categorically answered that it would not.

The first witness for the State was Frank Wilkes, who testified that on April 21, 1966, at about 7:30 p. m., he and his partner unloaded some merchandise at his antique shop at 1944 North Damen Avenue, after which his partner went inside. Wilkes pulled the truck around the corner on Homer Street, about 20 feet from the shop, and at that time some people threw open both doors of the truck and began clubbing him. (He identified the defendant as one of the assailants.) The defendant then struck him twice with a pressure cooker, and the defendant's companion hit Wilkes from the other side; during this time a girl who was with the assailants was shouting, "Grab him, kick him, grab his purse, grab his wallet, kick him hard." The defendant then picked up a hammer and swung it at Wilkes' head; it struck a glancing blow and the head of the hammer flew across the street. The woman then grabbed Wilkes' legs; he fell, and the three persons kicked him as he lay on the ground.

Wilkes testified that after the three had escaped, he noticed that $11 was missing from his wallet, as well as

a valuable gold coin piece he wore around his neck. Short-ly afterwards a squad car arrived and Wilkes got into the car to talk with the officers. At this time another squad car (with the two suspects in it) pulled up and parked about seven feet away. Wilkes was unable to see the suspects well enough to recognize them from that distance. When both squad cars went to the police sta-tion Wilkes got out and faced the suspects and identified them as the men who had attacked him.

Wilkes testified that he had jerked a jacket off the defendant when he tried to get away, and that the other man (Catalano) was wearing a dark sweater, either black or maroon. Wilkes stated that during the attack he was struck on the side four or five times, resulting in swelling, two broken ribs and a swollen ear.

Officer Victor Hoffman testified that he was in a pa-trol car on April 21, 1966, about 8:30 p. m., when he was stopped by a citizen on North Damen Avenue; that he then went to Damen and Homer, where he saw Wilkes and noted his bruised and swollen neck and torn trousers. After talking with Wilkes, Hoffman and his partner pro-ceeded to an alley south of Homer and Damen, where they saw the defendant and Catalano running out of an adjoining alley; the men were disheveled in appearance, and when searched by the police Catalano was found to have $12 on his person; no money was found on the defendant. The defendant was wearing a white shirt, gray trousers with hanging suspenders, and the shirt was outside the trousers. Catalano wore a maroon sweat-er and dark trousers. The officer placed both men under arrest.

At the trial the State offered in evidence a dark shirt which was found in the alley; this exhibit was objected to but was admitted over the objection.

The first objection made by the defendant in this court is that the identification was suggestive and violated due process of law. During the attack Wilkes had grap-

pled with the assailants; shortly after the robbery he confronted the defendant at the police station, and at the trial he pointed out the defendant as the man who had beaten and robbed him; and he stated that he had seen the defendant a couple of times before in the neighborhood. The defendant claims that Wilkes should have identified him while he was sitting in the squad car; however, Wilkes' explanation of his failure to do so was sufficient.

The defendant complains of the fact that a police officer, prior to the identification at the police station, said to Wilkes: "We have the men who assaulted you."

Defendant also complains that Wilkes identified him without his having been placed in a lineup. In People v. Snell, 74 Ill App2d 12, 219 NE2d 554, the court held that while it is preferable to have a witness identify a party from a group of unknown persons, failure to follow this practice goes only to the weight of the evidence, and is not necessary. The court said at page 22:

> "Where, as here, the witness was present during the commission of the crime, had ample opportunity to observe his assailant, and was called upon to make the identification after a lapse of less than an hour from the time of the occurrence, his testimony, if otherwise credible, can be sufficient for conviction notwithstanding failure to employ an ideal identification procedure."

In People v. Byrd, 21 Ill2d 114, 171 NE2d 782, the court said at 117:

> "Defendant also contends that at the lineup the police officers pointed out and identified defendant before the witnesses had identified him. The evidence is conflicting on this point. However, this circumstance, even if proved, would go only to the weight and credibility of the witnesses' testimony."

222

The defendant cites People v. Botulinski, 383 Ill 608, 50 NE2d 716, in which the rule is set out that the proper way to have a witness identify, without suggestion from any officers or any interested persons, is to pick out the guilty party from a number of persons unknown to the witness. However, on page 615 the court said:

> "We have held that where one accused of a crime is brought alone before the witness for the purpose of identification, such identification is not entitled to the same weight and credibility as where the witness picks out the accused from a number of persons brought before the witness. [Citing People v. Sanders, 357 Ill 610.]"

In the Sanders case the court held that where the witness is told in advance of the identification that the guilty party is in the custody of the police and the prisoner is produced alone for the purpose of identification, the weight of the evidence of identification is impaired. And it has been held that a positive identification by one credible witness is sufficient to support a conviction. People v. Saravia, 64 Ill App2d 479, 211 NE2d 560; People v. Soldat, 32 Ill2d 478, 207 NE2d 449.

■ In the instant case, during the struggle, Wilkes had full opportunity to observe the defendant, and he testified that his recognition of the defendant was aided by the fact that he had seen him a couple of times before in the neighborhood. He identified the defendant at the police station shortly after the robbery, and again in court. His identification was sufficient, and the trial court properly accepted it.

■ Wilkes also testified that when the police talked to him in the squad car he told them the assailant had bushy black hair; that he was a little taller than Wilkes, who was 5′ 9″; and that he was a very young man. (The police officer testified that in his opinion the defendant

was 19 or 20 years old.) He did not mention the matter of the man's weight. The defendant complains that the prosecutor said to the jury that Wilkes had stated that he thought the defendant was probably Mexican or Indian. No such statement was made by Wilkes, but this inadvertent remark on the part of the State, while improper, was not reversible error.

█ The defendant also argues that the foregoing argument of the prosecutor was improper, as well as his statement about a shirt found by the police in the alley near the place of arrest. The defendant was said to have walked out of an alley a few feet from where the incident took place, and that the shirt matching the description given by Wilkes was found in the alley. It is true that Wilkes gave no description of the shirt worn by defendant, and the police officers testified that the defendant was wearing a white shirt at the time of his arrest. The argument was not prejudicial.

█ The prosecutor also stated that Wilkes had testified he saw the defendant "take off across Damen Avenue, across the street"; Wilkes did not testify to such a fact. What he did say was that at the time the police officers first came to question him, the defendant had already fled; "they were across the street, yes." At the time of the assault the truck was parked on Homer, approximately 4 or 5 feet west of Damen. Officer Hoffman testified that after the conversation with Wilkes, he and his partner went looking for two men, and they went into the alley south of Homer Street, which was eastbound from Damen, about 100 feet from the intersection. The statement of the prosecutor concerning the testimony of the police officers was not improper. Furthermore, no objection was made to the argument at the trial. In People v. Conrad, 81 Ill App2d 34, 49, 225 NE2d 713, the court said:

"Defendant attempts to raise on appeal for the first time the alleged prejudicial nature of other statements made by the prosecutor. However, since no objection was made at trial the issue is waived."

And the court in People v. Gaston, 85 Ill App2d 403, 229 NE2d 404, said:

"Where the defendant's attorney does not object to the argument deemed improper, the court will not reverse unless it appears that he was deprived of his right to a fair trial."

It has been held that statements based on the evidence or on legitimate inferences deducible therefrom do not transcend the bounds of legitimate argument. People v. Woods, 26 Ill2d 557, 188 NE2d 1; People v. Allen, 73 Ill App2d 256, 219 NE2d 653.

The arguments made by the prosecutor in the instant case did not have the effect of depriving the defendant of a fair trial, and therefore should not be considered by this court.

Defendant also argues that he was deprived of a fair trial because of improper remarks by the court. As we have pointed out earlier in the opinion, the court ordered the defendant excluded from the courtroom in accord with the rule laid down in People v. DeSimone, 9 Ill2d 522, 138 NE2d 556, in which case the defendant refused to enter the courtroom at various stages of the proceeding, and thus voluntarily absented himself from the trial. On other occasions he caused disorder in the court by profane outbursts directed at witnesses in the court. After one such outburst the court caused the defendant to be removed from the courtroom. The Supreme Court held that the provision of section 9 of Article II of the Illinois Constitution (which ordains that an accused shall have the right to appear and defend in person) may

225

be waived; and the court further held that the defendant did waive his right.

In the instant case, after the defendant was removed from the courtroom the following colloquy occurred between the court and defense counsel (Van Zeyl):

> The Court: Mr. Van Zeyl, did you have any conversations with him about being present during the trial?
>
> Van Zeyl: Yes, I did.
>
> The Court: What did he say?
>
> Van Zeyl: Yesterday afternoon at the County Jail he indicated to me by inference—not positively, but just asked me the question as to what would happen if he did something in the courtroom. I made the remark to him, not to play games with me, I am his lawyer. I told him that if he so chooses he would voluntarily absent himself from the courtroom. He wanted to know what that meant and I explained, I told him that he had a right to waive his presence during the trial.
>
> The Court: And he has chosen not to be present.
>
> Van Zeyl: I also spoke to him back in the lockup in back of the courtroom.
>
> The Court: Today?
>
> Van Zeyl: Yes. I went back there at two o'clock before the jury was summoned into the courtroom and I asked him what he wanted to do here today. He told me "leave me alone." I asked him, "Well, I'm your lawyer, I have to know what I am doing when he stepped out before your Honor."
>
> He said, "leave me alone," and he grabbed me by the tie and tried to pull me through the bars.

At this point I saw no further use in conducting any kind of a discussion with him, so that's all I know at this time.

██ During the trial defense counsel made the following statement to the jury:

Confine your deliberations solely to what you heard from the stand, irrespective of what mental problem the defendant may have now or may have had yesterday or—

At this point the Assistant State's Attorney objected, saying there was no showing of any mental problem, and the objection was sustained. Defense counsel said, "Well, judge, I think that's obvious." The court said: "Now, I said sustained, Mr. Van Zeyl." Mr. Van Zeyl said, "All right." The court said, "I don't think there is."

██ On September 8, 1966, the defendant had a fair trial and was proved guilty beyond a reasonable doubt. The Criminal Code of 1961 (Ill Rev Stats 1963, c 38, § 1–7 (m)) is as follows:

When a person shall have been convicted of 2 or more offenses which did not result from the same conduct, either before or after sentence has been pronounced upon him for either, the court in its discretion may order that the term of imprisonment upon any one of the convictions may commence at the expiration of the term of imprisonment upon any other of the offenses.

The Committee which prepared the draft of the Code adopted by the legislature has said in its comments:

Subsection (m) is intended to codify the holding in People v. Schlenger, 13 Ill2d 63, 147 NE2d 316 (1958), by the implicit converse of the provision stated, i. e., if the offenses resulted from the same

227

conduct the defendant may not be sentenced on both, either concurrently or consecutively. "Conduct" is defined in section 2–4 and is used in the sense of "the same transaction" discussed in Schlenger, supra.

See People v. Schlenger, 13 Ill2d 63, 147 NE2d 316; People v. Duszkewycz, 27 Ill2d 257, 189 NE2d 299; People v. Ritchie, 66 Ill App2d 302, 213 NE2d 651; and People v. Ritchie, 36 Ill2d 392, 222 NE2d 479. In People v. Peery, 81 Ill App2d 372, 225 NE2d 730, it was held that even where the question of the improper sentences is not raised (as it was not in the case before us) in the reviewing court, the reviewing court must take notice of it.

██ ██ Under the authority of the statute and the above cited cases, concurrent sentences for crimes resulting from the same conduct are improper, and the conviction of the lesser crime must be reversed. Therefore, the conviction on the robbery charge is affirmed, and the conviction for aggravated battery is reversed.

Affirmed in part, reversed in part.

LYONS, P. J. and BURKE, J., concur.