THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT BOOKER HANNAH, JR., Defendant-Appellant.

(No. 72-35;

Third District—May 9, 1973.

James Geis, of Defender Project, of Ottawa, for appellant.

G. Trent Marquis, Assistant State's Attorney, of Rock Island, for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

On May 4, 1971 Robert Booker Hannah Jr., the defendant was charged with robbery and aggravated battery. After a bench trial the defendant was found guilty of aggravated battery in the Circuit Court of Rock Island County. On Sept. 28, 1971 the defendant was sentenced to a term of 3 to 10 years, to be served concurrently with a 1 to 5 given for violation of probation.

On April 22, 1971 at about 8:30 P.M. Jerry Licata, went to the Sheraton Motor Inn, Rock Island, Illinois, to meet some friends. He

remained there until about 1:30 A.M., during which time he drank an estimated eight glasses of beer. About 1:30 A.M., he went across the street to the Tiger's Den to have one more drink with his friends. His friends left about 1:45 A.M., and he walked back to a pool table area in the rear of the Tiger's Den. This area was illuminated by a light over the pool table and by floor lights. He remained there for about one-half hour watching and betting on several games. He testified that the defendant played in all the games (he thought four); and that defendant was wearing a T-shirt and levis.

After about one-half hour in the pool area, Mr. Licata went back to the bar and got a rum and coke. He remained at the bar until closing time at 3:00 A.M. He was one of the last ones to leave the bar. The defendant and his friends left just a few minutes before Mr. Licata.

Janice Daniels testified that Licata did not appear drunk when he left. She also testified that it was like daylight outside the Tiger's Den. Licata testified that the street lights were quite bright.

Licata testified that he left the Tiger's Den, turned east, took several steps and was attacked by a man who hit him, knocking him down and kicked him into a state of shock. He stated he first saw his assailant when the assailant said, "Hey man, how about my five or ten". Licata testified that he could clearly see his assailant prior to being attacked and positively identified him as the same person who had been playing pool earlier. He identified the defendant as being the assailant. He also got a full body view of the assailant as he fled.

Licata refused to go to the hospital and was taken home. He was in shock after the beating. He was in great pain the rest of the morning and finally went to the hospital that afternoon by ambulance. He was treated for lacerations and underwent surgery for the removal of a ruptured spleen.

Two days later, while still in the hospital, Licata was shown five or six pictures by police, and *told that defendant might be among them.* Licata positively identified the third picture he looked at as being the assailant. All of the pictures were of black males of the approximate age of 24 to 28.

Licata testified that his identification of the defendant was based on his recollection of the event and not the pictures he was shown in hospital. He also testified that his assailant wore levis and a T-shirt and had facial and head hair not much different than the defendant did in court.

The defendant testified that he went straight from the Tiger's Den to his brother's house with one Virgil Mayberry who was no longer in the area; that his head was shaved bald and that he never wears levis and

T-shirts; that he left the community the next day but returned on June 2 after his mother told him the police wanted him.

The defendant's testimony regarding his hair was supported by his mother, and a minister who could recall how the defendant looked in April but was unable to recall any details about defendant's appearance in March, May, June or July.

In addition to the complaining witness three occurrence witnesses testified for the State. Knute Rodland testified that he was not positive but could make a 99% sure identification of the defendant as the assailant. Caroline Day and Caroline Serale could not positively identify the assailant. All three witnesses gave consistent testimony that the assailant was: Negro; stocky; in his 20's; short cropped hair; wearing levis and T-shirt or tight sweater.

In rebuttal Ray Barnhart was called to impeach Mrs. Hannah, the defendant's mother and a prior conviction of the defendant was admitted for impeachment.

The defendant first contends that he was not proven guilty beyond a reasonable doubt because the identification testimony of Licata was tainted by the police statement at the photographic identification, that Licata was in shock after the first punch, that he was under the influence of alcohol and that his first description to the police was only that the assailant was a Negro.

■■ The weight to be given the testimony of Jerry Licata under the circumstances is governed by well established rules. The credibility of witnesses and weight to be accorded their testimony is a matter for the trier of fact and should not be overturned unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt.

■■ It is equally well settled that the testimony of a single witness may convict, if that witness is credible, and he viewed the accused under such circumstances that he can make a positive identification. *People v. Stringer*, 289 N.E.2d 631.

The evidence is not so "unreasonable, improbable or unsatisfactory as to leave a reasonable doubt as to defendant's guilt". *People v. Scott*, 38 Ill.2d 302, 306, and the trial judge was in more advantageous position than we to assess the credibility of the witness.

■■ It is always important that photographic procedures be conducted fairly. When photographs are shown, the officer should in no way indicate a suspect's photograph is included. This practice has been repeatedly condemned by the courts, however, here the in-court identification had an independent origin i.e., the trial identification was established to have been based on Licata's observations at the time of the crime and unaffected by the suggestive pre-trial procedure. (*People v. Durant*, 105

Ill.App.2d 216; *People v. Drayton*, 288 N.E.2d 922.) As we have noted, the victim here had ample opportunity to observe his assailant under what he described as good lighting conditions. His prior observation was more than sufficient to serve as an independent origin for the in-court identification.

Defendant next contends that it was error to admit prejudicial hearsay testimony under the guise of impeachment.

Mrs. Jeannette Hannah, the defendant's mother was called as defense witness to corroborate the defendant's statement of his physical appearance on April 23. On cross-examination she was asked if the defendant had ever told her that he had got into a fight with Jerry Licata. She denied that he had so told her. She was then asked over objection if she had told Ray Barnhart (defendant's probation officer) that defendant had told her he had a fight with Jerry Licata. This she denied. Ray Barnhart was called as a rebuttal witness and he then testified, over objection, that Mrs. Hannah told him that the defendant had told her he had a fight with Jerry Licata.

■■■ Robert not being present, the statement to Barnhart is hearsay and incompetent as against Robert who was then on trial. As was said in *People v. Grigsby*, 357 Ill. 141: "* * * If the witness admitted making the statement, it would prove nothing except that she * * * had said so." Here we have a hearsay statement of a witness as to an admission or declaration of the accused tending to incriminate him placed before the trier of the fact on the theory that it is admissible to impeach the witness who denied making such statement. What Mrs. Hannah stated out of court and out of the presence of the defendant is pure hearsay and incompetent. (*People v. McKee*, 39 Ill.2d 265, quoted with approval in *People v. Montgomery*, 51 Ill.2d 198, 207.) In *McKee* the witness was confronted with contradictory written statements he had made to the police wherein *he had said that McKee had said* that he had had to shoot the man. The Court said, "What the witness stated out of court and out of the presence of the defendant is pure hearsay and incompetent. * * * Such evidence is not competent even for the purpose of impeachment where the statement bears directly upon defendant's guilt or innocence. The prejudicial effect upon a jury would be too much."

The policy involved is the protection of the defendant against the hearsay use by a jury of the previous statement, in the belief that the ritual of a limiting instruction would unlikely be heeded by a jury. See McCormick on Evidence, Second Edition, Sec. 36. (Example given there: witness for defense who denied she heard defendant say he was going

to kill deceased, improperly allowed to be impeached by proof that she had said she had heard such threats.)

In *People v. Kimbrough*, 131 Ill.App.2d 36 (1972) the impeaching witness testified that, *"Nora said that Grady* said he had shot somebody." The Court relying on *McKee* and *Grisby* stated, "What the witness stated out of court and out of the defendant's presence is pure hearsay and incompetent."

In *People v. Hundley*, 4 Ill.2d 244 a similar prior statement was held to be hearsay and not competent even for impeachment.

We are not unaware of the holding in *People v. Newman*, 30 Ill.2d 419 (1964) where a witness was asked if the defendant told her what he did. She replied, "No" and was made a court's witness. She admitted making a written statement wherein she stated, "I then asked him if he had got in the gas station and he said, 'yes'." In reversing because of failure to give a limiting instruction to the jury, the court felt that the impeachment would be proper in the new trial if the voluntary character of the statement was established. (She had testified that the police threatened her.)

*People v. Collins*, 49 Ill.2d 179 (1971) also had similar hearsay type of prior statements, "Theodore told me they had shot a white man and the next day Lamont told me they had shot that man in Hyde Park". The defendants *did not raise the issue* that this was improper impeachment.[1] The sole contention was that it was error to permit the statement to be received in evidence without a limiting instruction. Amicus briefs were filed urging the Court to allow the use as substantive evidence. The Court said, "There remains for consideration the question of the effect to be given Robinson's statement upon a new trial  *  *  * is their effect to be limited to an attack upon his reliability  *  *  *." After a thorough discussion the court refused to change the present law and refused to adopt a new rule allowing the substantive use of prior out of court statements.

Which brings us to the next issue:

■■ The trial judge in admitting the evidence of Mrs. Hannah's statement declared that it was for impeachment purposes, yet he treated it as substantive evidence. In announcing his decision the Judge stated:

> "The Court does believe that there is proof beyond a reasonable doubt that the defendant is guilty of aggravated battery as charged in the second count and the court makes that determina-

---

[1] *People v. Marino*, 44 Ill.2d 562 (1970) had just been decided. Their defendants relied on *People v. McKee* which was distinguished.

tion upon the identification of those who witnessed the fight, *plus the fact that the testimony of Ray Barnhart established that the statement of Mrs. Hannah indicated that Robert had a fight with Jerry Licata.*"

The identical situation arose in *People v. McKee,* 39 Ill.2d 265. On page 271 the court stated, "\* \* \* there is a presumption that he will consider only competent evidence in reaching his decision, and the admission of such testimony, even if error, is therefore not prejudicial. (*People v. Cox* 22 Ill.2d 534.) The finding of the court here prevents application of this rule. \* \* \* This 'evidence' was incompetent; it was hearsay; it was admitted as evidence under the guise of impeachment and had no probative value as to the guilt of defendant."

■■ Under the circumstances and the precedents previously cited we can only conclude that the court's finding was based in part on incompetent evidence which was so highly prejudicial to defendant as to require a finding of reversal error. On remandment and a new trial free from such prejudicial error the question of guilt or innocence can be determined.

Because a new trial will be necessary we must consider another contention of defendant.

Prior to trial the defense made a motion to determine the admissibility of defendant's prior robbery conviction on June 16, 1970 which was denied. After the close of the defense evidence the record was offered to impeach defendant's testimony and was admitted over objection.

In exercising its discretion as to whether or not the 1970 conviction of the defendant for robbery should be admitted into evidence for impeachment purposes, the trial judge should be guided by the considerations noted in *People v. Montgomery,* 47 Ill.2d 510.

For reasons stated the judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

ALLOY, P. J., and STOUDER, J., concur.