People of the State of Illinois, Plaintiff-Appellee, v. John Williams and Henry Steele (Impleaded), Defendants-Appellants.

Gen. Nos. 52,753, 52,754. (Consolidated.)

First District, Fourth Division.

November 19, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Herbert Becker, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellants.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSES CHARGED

Armed robbery, Ill Rev Stats (1965), c 38, § 18–2; and two charges of aggravated battery, Ill Rev Stats (1965), c 38, § 12–4 and § 12–4(b) (2).

JUDGMENT

After a bench trial, John Williams and Henry Steele were found guilty of all charges, and were given concurrent sentences of 1 to 5 and 3 to 8 years, respectively, on each count. A codefendant, Jimmie Williams, was found not guilty.

POINTS RAISED ON APPEAL

(1) The identification of defendants was improperly made and based upon inadmissible testimony, resulting in prejudice to defendants.

36

(2) Alibi evidence, coupled with prejudicial identification testimony, raises a reasonable doubt of defendants' guilt.

EVIDENCE

Ben Zemel, for the State:

On March 24, 1967, at approximately 4:00 p. m., he was about to close the doors of his produce business when three men entered the premises. The first said he wanted a case of eggs and then another hit him with a "billy" club. They were brandishing a double-barrelled, sawed-off shotgun and a pistol, and declared that this was a holdup. Steele, the man who had struck him, then herded him and his sons into the cooler located on the first floor. Later, Steele ordered him to come out, led him to the office, and told him to open the safe. He opened it and gave Steele the money, and again was struck on the head with a pistol.

Steele said more money was hidden away, but witness denied it, whereupon Steele ordered one of witness' sons out of the cooler. Witness told Steele to leave his son alone and he would give him his wallet. Thereupon, he gave Steele his wallet containing $100, and Steele hit him over the right eye with a pistol, rendering him unconscious. Before that, he had seen the other two men and identified them in the courtroom as Jimmie and John Williams. The office was well lighted and he had seen the faces of the robbers. All three men had guns. The robbery took about 15 minutes. A total of about $600 was taken.

He had seen Steele on occasions prior to the date of the robbery, as "he used to come around and hang around the place." Steele had applied to him for a job but was refused employment. On the day before the robbery, Steele was "hanging around" on the street outside his place of business.

In the hospital, he identified a photograph of Steele from a group of about a dozen photographs shown to him by the police. On April 14, 1967, he saw Steele in a lineup of about half a dozen men at the police station. On May 2, 1967, he identified Jimmie and John Williams in a lineup. The police had told him, on both occasions, that they thought they might have the men who were the robbers. At the second lineup, he initially picked the wrong man, but he then took a closer look, realized his error, and picked the Williams brothers.

Henry Zemel, for the State:

He was working at his father's place of business on March 24, 1967, when three men (identified as the three defendants) came in and, after Steele asked for some eggs, they said it was a stickup. Jimmie Williams carried the shotgun and ordered everyone into the cooler. He went into the cooler and stayed about 10 minutes, when his brother kicked the door open. Upon running out, he saw his father with his eye torn, in a state of shock, and "blood all over the place." His brother went next door and called the police, as the phone had been ripped out. At a police station lineup of four men, he saw the two Williamses and pointed them out.

Paul Zemel, for the State:

His testimony corroborated that of his brother, Henry. In addition, he testified that John Williams held a pistol to his stomach, and Steele hit his father over the head with a billy club. When Jimmie Williams had directed them to the cooler, he said, "Get over there or I'll blow your head off." At the hospital he gave a description of the robbers to the police. (The police reports including this description were given to defense counsel at the trial.) He had seen Steele before at his father's place of business quite often, and, when shown his photograph a few days after the robbery, he said, "[t]hat's him." He saw the two Williamses at a lineup on May 2, 1967.

38

Harold Marsicek, for the State:

He was a police detective on March 24, 1967, and, along with Detective O'Connor, talked to Ben Zemel in the hospital on that day in the course of investigating the robbery in question. On March 27, 1967, they again visited Zemel in the hospital and showed him Steele's photograph, which he identified. They then obtained a warrant for Steele's arrest and went to his home. Steele's wife admitted them and they found Steele under the bed and arrested him. Defendant was taken to the station and was identified in a five-man lineup by Ben Zemel and his son.

On May 2, 1967, he arrested John and Jimmie Williams at the same address where he had arrested Steele. They were both identified by the three Zemels out of a line-up of four men.

Robert Lang, for the defense:

He was Jimmie Williams' employer at Garfield Furniture Company on March 24, 1967. He testified that on that day, Jimmie Williams was driving a truck for him and had last left the office at 12:30. Frank Baldwin was his helper on the truck. He did not see Jimmie again until the next morning, but he had talked to him over the phone at 3:30 p. m., when Jimmie Williams called collect while at Hoffman Estates, where he had delivered some furniture. That was approximately 40 miles from the loop. A telephone bill showed this toll charge. They made another stop later that day on Foster Avenue, Chicago.

Frank Baldwin, for the defense:

He was Jimmie Williams' helper on the day in question. At 3:30 p. m. they were together making a delivery at Hoffman Estates, and got back to 3500 Foster Avenue by 5:00 p. m. He saw Jimmie make a call to the office at 3:30 p. m.

Mary Lukes, for the defense:

She knew all three defendants. Steele had lived at her apartment, and she was there when he was arrested. John Williams used to live there. On March 24, 1967, she saw him at noon when he stopped at her apartment. He called her at 3:00 p. m. and asked to borrow money to buy some shoes. She said she would arrange it, so at 3:45 p. m. she and her daughter, Judy, met him and got the shoes. Judy went with John Williams to get something to eat while she shopped, and they rejoined her at 4:30 p. m. to 5:00 p. m.

Judy Marie Lukes, for the defense:

She was 14 years old at the time of the occurrence, and her testimony was substantially similar to that of her mother.

Alfred Haven, for the defense:

He is a security representative for Illinois Bell Telephone Company. It was stipulated that company records indicate that a collect call was made on March 24, 1967, at 3:32 p. m. by a man named Jimmie to the Garfield Furniture Company from a residence in Hoffman Estates.

Jimmie Williams, on his own behalf:

On the day in question, between 3:30 and 5:00 p. m., he was driving between Hoffman Estates and 3500 Foster Avenue, Chicago. He had placed a call to the office from Hoffman Estates about 3:30 p. m. He did not rob Mr. Zemel.

Henry Steele, Jr., on his own behalf:

On March 24, 1967, he was employed distributing baking flour for C. and J. Company, and was not at the place of the alleged robbery. He had seen Ben Zemel on quite a few occasions, but did not take part in the robbery, nor was he there the day before. He does not know Jimmie Williams, but did know John Williams, who is a friend of his relatives, the Lukeses, with whom the witness lived.

On direct examination, he testified that on the day in question he was not in John Williams' company. On cross-examination, however, he said that he was with him at different times that day, since they worked together. He finished work around 2:30 or 3:00 p. m., and did not see Williams again.

John Williams, on his own behalf:

He had never seen the Zemels and was never in their place of business. He was arrested on May 2 and placed in a lineup with his brother and two other men. Ben Zemel picked one of the other men, and police called him over. Zemel came back after a brief conversation with the officers, and picked defendant and his brother.

On March 24, 1967, he was at work unloading flour along with defendant Steele, who was still there when the witness left at 12:30 p. m. to go to Mary Lukes' house. He met her and her daughter at about 3:30 p. m., borrowed money from her, and bought a pair of shoes. He couldn't get his own check cashed, since it had the name wrong and had to be corrected.

OPINION

Defendants contend that the methods utilized by the police in obtaining identifications of defendants were improper and prejudicial, and that the identifications resulting therefrom should not have been admitted into evidence.

The first alleged impropriety concerns the showing of a photograph of defendant Steele to Ben Zemel at the hospital prior to Steele's apprehension. Steele contends that this technique is highly suggestive, as it firmly implants in the witness' mind the defendant's image, and serves as the basis for later identifications. The United States Supreme Court, while recognizing the possibility of detrimental use, supported the technique in Simmons v. United States, 390 US 377, where the court stated at page 384:

Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint of both apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at the trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very strong likelihood of irreparable misidentification.

█ We find no impermissive suggestion in the instant case. Three days after the robbery, while in the hospital, the witness was shown approximately 12 photographs from which he picked one of defendant Steele, a man whom he had seen frequently before, and whom he had seen, in good light, for about 15 minutes during the robbery. From the photograph identification, a warrant was issued for Steele's arrest. This sequence of events indicates that the police were attempting only to discharge their proper investigative duties and were not abusing the identification process in a manner prejudicial to defendants.

█ Defendants also assert that the two lineups in the instant case were prejudicial, including prior sug-

gestive remarks made by police to the identifying witnesses that the robbers were in the lineup. Ben Zemel, the State's main witness, testified that before he viewed the lineup at which he identified defendant Steele, a police officer told him "that one of the men who I thought was the robber would be in the lineup." Zemel also testified in connection with the Williams lineup that "[t]he police didn't tell me anthing, they just thought they may have the men who were the robbers."

A proper lineup is designed to determine, if possible, the identity of the perpetrator of the crime under investigation. When a witness is asked to view a lineup, there is, necessarily, an implied suggestion that the police investigation has led them to believe that one of the persons exhibited in the lineup may have committed the crime. As stated in People v. McIntosh, 82 Ill App2d 90, 94, 227 NE2d 76:

> Any time a victim of a crime is asked to come to a police station to look over persons arrested, there is an unavoidable intimation that the police have arrested someone who they believe might be the perpetrator of the crime.

The remarks complained of in the instant case were not unfairly suggestive or prejudicial to defendants; they merely verbalized the obvious.

Both defendants contend that the lineups were numerically inadequate. Ben Zemel testified that when he identified Steele, there were "about half a dozen" men in the lineup, whereas, a policeman testified there were five. Similarly, at the Williams lineup, Zemel said there were five or six, and the police said four. Henry Zemel also said there were four. These discrepancies are insignificant. They do not render the lineups defective or prejudicial, but merely go to the weight of the identification testimony. People v. Donald, 29 Ill2d 283,

43

194 NE2d 227. So, also, do the number of persons in the lineup and the manner in which it is conducted. See People v. Boney, 28 Ill2d 505, 192 NE2d 920. In this case, Ben Zemel had seen Steele on previous occasions, and his opportunities for observation during the course of the robbery were sufficient to fix defendants' images firmly in mind. Under these circumstances, properly conducted lineups of four to six persons were adequate to prevent prejudice to defendants.

 Defendants also complain that certain testimony by Officer Marsicek was hearsay and therefore inadmissible. He testified that he saw the witnesses identify defendants at the respective lineups and also saw Ben Zemel identify the photograph of Steele. There was no objection to this testimony at the trial, so any error which may have occurred in its admission is deemed to have been waived. People v. Dial, 95 Ill App2d 345, 238 NE2d 122; People v. Hester, 49 Ill App2d 308, 200 NE2d 3. Even if hearsay testimony had been improperly admitted, reversal is not warranted where the same matter has been proved by independent and properly admitted evidence. People v. Frenchwood, 28 Ill2d 139, 190 NE2d 767. The identification testimony of the robbery victims in this case was sufficient to render the officer's testimony mere surplusage, and we find that no prejudice resulted therefrom.

Having considered all the arguments raised on behalf of defendant Steele, we conclude that his conviction should be affirmed.

Defendant Williams also contends that his identification was tainted because Ben Zemel originally selected another man in the four-man lineup, after which he had a brief conversation with the police and then picked John and Jimmie Williams. Zemel's testimony does indicate that initially he may have been unsure. The wit-

ness' son testified, however, that the man his father first tapped on the shoulder was facing backward and "he picked him, and then he said 'no, it's that one.'" We realize that there is conflicting testimony on this point, but we reiterate that, within the scope of the lineup evidence in this case, the facts testified to on the question of identification are merely factors to be weighed by the trier of fact. People v. Donald, supra; People v. Durant, 105 Ill App2d 216, 245 NE2d 41.

██ ██ Defendant John Williams further contends that since both his identification and that of Jimmie Williams, who was acquitted, stemmed from the same set of circumstances, a reasonable doubt exists as to his guilt. The argument is a nonsequitur, however, because of the distinct and different alibi evidence which was offered by these two defendants. Jimmie Williams' alibi evidence is strong and supported by several apparently disinterested witnesses who attested that he was many miles from the scene at the time of the crime. John Williams' alibi evidence is much weaker and, in parts, conflicting. The trial judge obviously believed the alibi of one and not the other, and we will not substitute our judgment for his on a matter of credibility. The basic conflict, therefore, is between the respective strengths of the identification testimony as to John Williams and the alibi evidence offered on his behalf. We conclude that, if believed, as it was, the record contains more than enough evidence to establish the guilt of John Williams beyond a reasonable doubt.

The judgments of the Circuit Court are affirmed as to both defendants.

Affirmed.

DRUCKER, P. J. and LEIGHTON, J., concur.