**STATE of Missouri, Respondent,**

v.

**Sam DAYTON, Appellant.**

**No. KCD27759.**

Missouri Court of Appeals, Kansas City District.

March 1, 1976.

Motion for Rehearing and/or to Transfer Denied March 29, 1976.

Application to Transfer Denied May 5, 1976.

Robert Beaird, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SHANGLER, Presiding Judge.

The defendant Sam Dayton was indicted on four separate counts of felony which charged that, in concert with others, he kidnapped two youths and practiced upon them the abominable and detestable crime against nature. The trial was had upon an information in lieu of indictment which was an accusation of the same offenses. The defendant was convicted on all four counts; the jury assessed punishment of ten years on each count of kidnapping and one hundred and fifty years on each count of the crime against nature. The court ordered that the sentences run concurrently.

The brother and accomplice of the defendant, Jimmy Dayton, was convicted as a principal for the same offenses. Those convictions have been reviewed in an opinion adopted concurrently [State of Missouri v. Dayton, Mo.App., 535 S.W.2d 469] where the evidence of the events is related in abundant detail. We will not duplicate that narrative but make interstitial reference when the discussion of the events and issues require.

The evidence of the State showed that Jerry Dayton and Jimmy Dayton, brothers of the defendant, and Millard Swenson, their uncle, were co-actors in the episodes of abduction and pederasty for which the defendant was convicted.

The defense was both alibi and innocence on the open-court testimony of Jerry Dayton that it was he and three others who had seized the youths and submitted them to torture and molestation.

The victims of these perversions were D.E., a boy of eleven years and his playmate, G.D., who was then seven years old. On the late afternoon of April 12, 1974, the boys had rummaged a trash bin on the parking lot of the Baltimore Bank at 31st and Main when they were accosted by two men in a blue-green automobile. One of the men displayed a badge, and told the boys they were in arrest for the trespass of private property and ordered them into the rear of the car. [The older boy, D.E., identified the defendant as the front seat passenger.] Two other men were picked up and all proceeded to the Travelodge Motel [at 3240 Broadway] and entered room 210. Once there, the boys were directed to disrobe and then to shower, on the pretext that they would be required to do so anyway when they were delivered to the jail. Two of the men also disrobed. D.E. was then taken from the bathroom into the bedroom, but the younger boy was made to remain in the bathroom. Once in the bed-

room, D.E. was made to lie on the bed, and thus prone, was gagged and blindfolded, and tethered by his wrists and ankles to the four corners of the bed. He testified that five separate acts of anal penetration followed, the first four by men of different weights who lay upon him in succession, and the fifth by a hard, irregular object which hurt him. [The latter reference was to the dildo, an artificial priapus of exaggerated size the boy had seen strapped on Jimmy Dayton after the event.] This last penetration caused the boy to scream and induced a defecation and bleeding which covered the bedpad. He was also shocked and hurt by means of an electric cattle prod. At the conclusion of these molestations, the blindfold, gag and ties were removed from the boy.

The boys were once again separated; D.E. was sent to the bathroom to wash, and his younger companion was taken into the bedroom out of his sight.

The younger boy testified that he was forced to take into his mouth the penis of each of two men; then was bound to the bed in the same manner as was D.E., and was subjected to rectal sodomy. He, too, was shocked with the prod.

The boys both testified that the defendant Sam Dayton was present while these assaults of sodomy were committed.

The boys were then taken by automobile to a nearby dairy, warned not to tell of these events, and released.

Once home, the younger boy related what had happened to his mother who called the police. The boys were taken by the authorities to the Childrens Mercy Hospital, where examination of D.E. revealed a rectal tear and sperm in the rectal area. The examination of G.D. by Dr. Gialde found no evidence of sodomy to the younger boy. The report also disclosed that on specific and direct questioning G.D. denied any fellatio or anal penetration.

Following medical examination, D.E. led Officer Meadows and Detective Gowin to Room 210 of the motel. One of the occupants opened the door clad in his undergarments; Gowin identified himself as a police officer and informed the man and other occupants that they were in arrest. The officers then entered the room and found all four, defendant Sam Dayton, his brothers Jimmy and Jerry, and their uncle Millard Swenson.

Once inside, the officers observed and seized some tape lying in a trash can in the bedroom. Officer Gowin entered the bathroom and under the lavatory found a white bedpad, which was also seized. As the four were conducted to the patrol wagon, one of the suspects requested his jacket in the automobile. The officer accompanied the suspect to the car, unlocked the door with the key from the suspect, and removed the jacket. Lying under the jacket was a black case similar to the kind police officers carry. He opened it and found a badge with the inscription: *Special Police, Maryland.*

Sometime after midnight, a line-up was conducted in which the four suspects were displayed with two other men. A photograph of the lineup was taken. The photograph, police badge and bedpad were all received in evidence.

The bedpad, tape and other paraphernalia taken from the motel room were subjected to laboratory analysis, as well as certain hair samples found on the bedpad. These filaments were compared to cranial hair taken from the defendant Sam Dayton and one of them was found to fall within the range of variance of the sample taken from the defendant.

The defendant, by separate motions before trial, sought the suppression of the line-up identification, of certain evidence, and for a declaration that the boys were incompetent to give testimony. The motions were heard on evidence and were denied.

The defendant gave evidence of alibi by three witnesses [the substance of which is reported in the companion opinion] and from the brother of the defendant [also accused], Jerry Dayton. This brother testified that he and three other acquaintances had actually committed the offenses

charged against the defendant.[1] The witness admitted on cross-examination, to an affliction from cancer but denied that his testimony was prompted by a condition *in extremis*.

The defendant Sam Dayton also gave testimony which denied guilt. He testified that he spent all the time in question at the home of one Geraldine Tyler, a narrative which was supported in varying measure by the alibi witnesses Thomas Raye, Edna Sue Hogan and Geraldine Tyler, herself.

The first assertion on this appeal is that the bedpad [as well as the hair samples detected in that accoutrement] taken from the motel bathroom without authority of formal warrant or incident to a lawful arrest were the fruits of an unreasonable search and seizure in violation of constitutional provisions and should have been suppressed at the trial. The defendant does not contend want of probable cause for his custody or that the arrest itself was not validly executed, but only that the search of the bathroom exceeded the permissible scope of a search incident to arrest defined in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The State contends, rather, that a police officer may inspect areas close by the site of arrest from which a weapon may be obtained and that Officer Gowin was in the course of such a protective sweep when he inadvertently came upon the bedpad in plain view under the lavatory in the motel bathroom.

■ The Fourth Amendment requires that governmental searches be conducted under the authority of a valid search warrant or under circumstances which show the reasonableness of a warrantless search. Thus, warrantless searches are exceptions, not the rule. One such exception is a search incident to a lawful arrest. This exception rests on the reasonable expectation of a police officer that an arrestee will use any weapon he may have to make escape and that he will attempt to destroy any incriminating evidence in his posses-

sion. *Cupp v. Murphy*, 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the United States Supreme Court narrowed the permissible scope of search incident to arrest to include the person of the arrestee and [l.c. 763, 89 S.Ct. l.c. 2040] "the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence". This essential holding of *Chimel* [where the search was of the home premises of the accused where he was arrested] has been understood by our Supreme Court to mean that "the arrest of a person at home [does] not justify a routine search". *State v. Wiley*, 522 S.W.2d 281, 291[18] (Mo. banc 1975). It is plain then, that in the absence of anything more, the incursion by Officer Gowin into the motel bathroom was not justified as a search incident to the arrest of the defendant.

It is clear, nonetheless, that *Chimel* concerns the safety of the police officer in the conduct of an arrest. Accordingly, a rule of law has evolved which allows a police officer who makes an arrest in a dwelling place—as a self-protection from immediate danger—to make a cursory sweep for hidden accomplices in adjoining areas. Among the foremost of such federal authorities is *United States v. Briddle*, 436 F.2d 4 (8th Cir. 1970). There, upon the arrest of Briddle at his apartment, several police agents fanned out through the apartment premises to determine whether other persons were present who might prevent the arrest or present a danger to the officers in the apartment. One agent entered a bedroom, saw a shotgun on the floor; no other persons were found. Briddle did not question the right of the officers to make the cursory protective sweep, but contended the search which yielded the unregistered weapon for which he was convicted was illegal. The court affirmed the conviction [l.c. 7]:

1. The cross-examination testimony of Jerry Dayton included the *lapsus linguae*, later abjured by the witness, that his uncle Millard

Swenson was one of the men who had disrobed in preparation to their sexual assaults upon the boys.

The distinguishing and controlling fact, as we view the case before us, is that the shotgun was not discovered as the result of any search whatsoever. Rather, it was discovered by being in plain view in the bedroom which Special Agent Hancock entered in the exercise of his conceded right to conduct a quick and cursory viewing of the apartment area for the presence of other persons who might present a security risk.

*Chimel* was distinguished [l.c. 8]:

When he [Chimel] arrived home he was arrested under circumstances that did not occasion the officers to conduct a cursory viewing of the house premises concurrently with the arrest as a security measure. Nor is there any indication in *Chimel* that any of the challenged items had been in the plain view of any officer who at the time he saw the item was in a place where he had a right to be as a part of a concededly proper security check of the area where the arrest occurred.

This theory of protective search has been approved by our decisions. In *State v. Vineyard*, 497 S.W.2d 821 (Mo.App.1973), the police responded to a tip that a possible burglary by several persons was then in progress at a residence. An officer found one suspect after entering the unlocked house and then went into the utility room in search of the other reported suspects, and found the defendant hiding there. While there, the officer noticed a pile of shirts in the garage—visible through an open door. The shirts, part of a burglary loot, were received in evidence. The court rejected the contention that the shirts were seized as the result of an unlawful search and, citing *Briddle* as authority, responded [l.c. 826]:

As we view this case, the stolen shirts were not discovered as the result of any search whatsoever. The officers upon entering the house were not looking for things but persons. They had received reliable information that several subjects were in the house and had seen two of them in the garage before entering. Therefore, upon encountering only one subject upon immediate entry, the officers had a right to conduct a search of the premises to ascertain the location of the other reported subjects who could present a security risk, interfere with the arrest of Morelock, or escape.

*Vineyard* was approved by our Supreme Court in *State v. Miller*, 499 S.W.2d 496, 499[1, 2] (Mo.1973).

The defendant contends, however, that at the time of arrest and entry into the motel room, the police were acting on information from the boys—and were expecting—to apprehend four suspects, and that was in fact what they found. Unlike the search allowed in *Vineyard*, where the police had reason to expect danger from others not yet detected, or the search allowed in *State v. Henderson*, 510 S.W.2d 813 (Mo.App.1974) where the arrestee made a menacing move toward an adjoining bedroom where a pistol was discovered beneath the mattress, the defendant argues that no exceptional circumstances justified even a protective excursion into an area removed from the immediate control of the arrestees.

■■■ We cannot agree that the circumstances which confronted the two officers who conducted the arrest of the defendant and his three accomplices were unexceptional. The numerical superiority of the four was in itself a circumstance which allowed reason for one of the officers to glance into the bathroom—the only other source of possible danger from hidden confederates. The rule laid *down* in *Briddle*, however, and adopted by our courts in *Vineyard* and *Miller* require no demonstration of exceptional circumstances, but accept as a matter of infallible common sense that, as a matter of course, "a quick and cursory viewing of the apartment is permissible to check for other persons who might present a security risk". *United States v. Blake*, 484 F.2d 50, 57[7] (8th Cir. 1973). See, also, *United States v. Looney*, 481 F.2d 31 (5th Cir. 1973); *State v. Miller*, 126 N.J.Super. 572, 316 A.2d 16 (1973).

■■■ This rule which allows a police officer a cursory glance of the premises to insure safety against attack does not coun-

tenance an exploration for evidence. It recognizes that such a procedure is not a search in the constitutional sense; it does, however, accord the officer status to seize objects on the premises which fall in his plain view. The right of government to seize and use as evidence "objects falling in the plain view of an officer who has a right to be in the position to have that view" [*Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1936)] has long been settled. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1973) tells us that the plain view exception to the warrant requirement does not conflict with the law of search incident to arrest as expounded in *Chimel* :

> [Where] the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee.

■ The plain view doctrine requires not only that the officer have a prior justification for the initial intrusion, but that he came across evidence incriminating the accused inadvertently. *Coolidge v. New Hampshire, supra,* l.c. 466, 91 S.Ct. 2022. The legality of the presence of Officer Gowin in the bathroom has been shown as well as the inadvertence of the discovery. The defendant contends, however, that since by the admission of the officer, when he first viewed the bedpad "the defecation and things that were on it was [sic] all pulled over so you couldn't tell that anything was on it until you opened it", the incriminating nature of the evidence was not immediately apparent and thus was not in plain view. And, indeed, the stricture which prevents the plain view principle from extending into an exploratory search is that the seizure of an object under the doctrine is legitimate "only where it is immediately apparent to the police that they have evidence before them". *Coolidge v. New Hampshire, supra,* l.c. 466, 91 S.Ct. 2038; *United States v. Gray*, 484 F.2d 352, 356[2]

(6th Cir. 1973). Thus, the plain view doctrine operates only to excuse the necessity of a warrant; the precedent requirement of probable cause is not affected. *United States v. Truitt*, 521 F.2d 1174, 1176[3] (6th Cir. 1975). And probable cause exists where " 'the facts and circumstances within the knowledge [of the officers] and of which they had reasonably trustworthy information [are] sufficient within themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed". *Carroll v. United States*, 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). The inquiry, then, is whether the discovery of the evidence under the circumstances would warrant a police officer of reasonable caution to believe that an offense has been or is being committed and that the object in plain view is evidence which incriminates the accused. *United States v. Truitt, supra,* l.c. 1177; *United States v. Sheard*, 154 U.S.App.D.C. 9, 473 F.2d 139, 143[2] (1973).

■ In the circumstances of this case, there can be no doubt that Officers Meadows and Gowin had probable cause to believe that felonies had been committed. The defendant does not deny cause. The officers came upon a room in disarray and four suspects who fit the descriptions given by D.E. A knife described to them by the boys was found and seized, as were items of tape of the type by which they had been bound. Also, the officers knew that a bed had been used for the sexual assaults and were told by D.E. that the artificial phallus had induced defecation and bleeding on a blanket or bedpad. This information was sufficient to the reasonable conclusion by Officer Gowin that the bedpad open to his view in the bathroom was evidence which incriminated the defendant and those taken with him.

■ A cognate point raised is that the police badge was seized from the automobile as the result of an unlawful search. The initial entry into the vehicle was at the request and with the consent of the defendant who himself unlocked the door for the

retrieval of a garment. These are facts not disputed. When the jacket was lifted, a black leather case was apparent to the view of Officer Gowin. It was of the kind used by policemen. The two boys had told them about the police badge displayed by one of the abductors, so Officer Gowin opened the case and found the badge as the content. The initial intrusion into the vehicle was consensual and justified; on the principles we have already delineated, there was reasonable grounds to believe that the object in the form of a badge case contained the incriminating evidence which its appearance augered.

The defendant next contends that the line-up identification was so suggestive and conducive to irreparable misidentification that the admission of that evidence was denial of due process. The specific circumstances under attack are (1) that of the six persons exhibited at the line-up, four were suspects; (2) one of the non-suspects had facial hair and the other wore white shoes; (3) the line-up was conducted at about 3:00 a. m. when the boys were tired and sleepy; and (4) the police officers had told the boys that the four suspects had been arrested and would appear in the line-up. The brief cites no Missouri authority, but only *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), for the proposition that a line-up can be so suggestive as to deny a defendant due process of law.

■ The courts have recognized that "even the approved investigative methods, be it confrontation or photographic comparison, may be found improper if 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification'". *State v. Parker,* 458 S.W.2d 241, 243[1, 2] (Mo.1970), citing *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). This principle was reaffirmed by the United States Supreme Court in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) which delineated considerations for the reliability of an identification [l.c. 198, 93 S.Ct. l.c. 382]:

The central question, [is] whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

These factors have been considered by the recent decisions of Missouri courts in the evaluation of the suggestiveness of an identification confrontation. *State v. Jordan,* 506 S.W.2d 74, 81[11–14] (Mo.App.1974); *State v. Hudson,* 508 S.W.2d 707, 710[7–9] (Mo.App.1974). Nor is it open to question that although the photographic or line-up identification be suggestive or otherwise tainted, where there is an untainted, positive in-court identification made upon a factual independent basis, such in-court identification is proper. *State v. Ealey,* 515 S.W.2d 778, 780[2, 3] (Mo.App.1974).

The defendant contends the line-up was suggestive because Officer Gowin talked with the boys before the actual display of the six men. There is no doubt that they talked before the line-up. The deposition testimony of V., mother of D.E., acknowledged that the police took her son into another room for about thirty minutes before the line-up. G.D., the younger boy, testified that he knew the four suspects were among those to be shown because both D.E. and the policeman told him so. At the trial, D.E. admitted that he talked with the police before he saw the line-up, but denied that he had been told the four men arrested at the motel would be among them. His deposition testimony, however, had answered that question affirmatively.

It is to be noted that D.E. picked all four suspects out of the line-up. G.D., however, picked only three; the defendant Sam Dayton was not one of those identified at that

procedure. At the trial, both boys identified the defendant without resort to the photograph taken at the line-up.

At the hearing on the suppression motion, Officer Gowin explained the identities of those shown in the line-up; he explained that the boys were separated for the identification procedure and that he had not suggested to them that the men who had committed the sodomy would be among those shown. He wavered on cross-examination to the extent that he could have told the boys that "some men that had been arrested would be in the line-up" but did not suggest that the men who had attacked them would be among them. The testimony of D.E. on the pretrial motion was consistent with that given by the officer. He made the identification notations unaided and was not told that those suspected would be wearing any distinctive apparel.

It is not every suggestion that will invalidate a line-up procedure, but only such as tend to the substantial likelihood that a misidentification will result. In *State v. Walters,* 457 S.W.2d 817 (Mo.1970), an assault victim was taken to the police station where she recognized one photograph as that of her assailant. A month later, she viewed a line-up after she had been told by the police that they had the man she had earlier identified. The court concluded [l.c. 822] that the line-up procedure was not defective because of that suggestion where her in-court identification rested on an independent basis. A line-up itself suggests to a witness called upon to make the view that police investigation has led them to believe that one or more of those exhibited may have committed the crime. That was the conclusion of the court in *People v. Williams,* 117 Ill.App.2d 34, 254 N.E.2d 81 (1969). A witness to a robbery testified that before he viewed the line-up at which he identified the defendant, a police officer had told him: "One of the men who [you] thought was the robber would be in the line-up". The court affirmed with the comment [l.c. 86]:

Any time a victim of a crime is asked to come to a police station to look over persons arrested, there is an unavoidable intimation that the police have arrested someone who they believe might be the perpetrator of the crime.

The record is far from conclusive whether, in fact, Officer Gowin made the suggestion attributed to him. If so, the identification by the boys had nevertheless such substantial independent basis [later detailed] as to dispel any taint of misidentification.

The defendant attacks the line-up on the further ground that only two non-suspects were included with the other four. Officer Gowin testified that the two were the only other white males in the jail at the time. The defendant suggests the display should have been deferred when more white males were available. The administration of justice is better served by a prompt display of a suspect to witnesses of a crime because it reduces the time between the event and the confrontation, and thus allows a more reliable recall by the witness. Such a procedure also allows the speedy release of one no longer suspect. *State v. Jordan,* 506 S.W.2d 74, 81[11–14] (Mo.App. 1974). This consideration also justifies the conduct of the line-up in the early morning, after the hour the boys customarily went to bed. There is nothing in the evidence to suggest the boys were not alert at the time of the line-up, but only that their sleep had been interrupted.

Finally, the defendant argues that the two non-suspects were readily distinguished from the four suspects because one of the two was the only one with a moustache, while the other was the only one wearing white tennis shoes. A line-up does not require exact conformity, either of physical characteristics or garb, among the participants. Such differences do not usually, without more, make a line-up unduly suggestive. *State v. Word,* 527 S.W.2d 708, 710[2, 3] (Mo.App.1975).

The post *Stovall* test in Missouri to determine whether a lineup is prejudicially unfair depends upon the circumstances considered. In the adjudication of the

rule, the Missouri courts have adopted a three-fold test, articulated somewhat differently, but of the same scope and intention as in *Neil v. Biggers, supra* : (1) The presence of an independent basis of identification, (2) the absence of any suggestive influence by others and (3) the positive courtroom identification. *State v. Parker*, 458 S.W.2d 241, 244[2] (Mo.1970); *State v. Holland*, Mo.App., 534 S.W.2d 590 [adopted March 1, 1976]. The presence of a single suggestive element will not violate due process when the evidence overwhelms on the other two. *State v. Tidwell*, 500 S.W.2d 329, 331[3–5] (Mo.App.1973).

■ Since only D.E. identified the defendant Sam Dayton at the lineup, that procedure did not suggest the defendant to G.D. The boys both positively identified the defendant at the trial, and certainly there was sufficient independent basis for that identification. The boys were captives of the two men for hours and, except for the time each was gagged, blindfolded and staked, their opportunity to view each of the suspects was unrestricted. These observations allowed sufficient basis for the in-court identification. There was no error in the denial of the motion to suppress that evidence.

■ The defendant next contends that the term of one hundred and fifty years imposed on each count of the crime against nature, even though made to run concurrently, infringes the constitutional provisions against cruel and unusual punishment. The defendant argues that § 563.230 which defines the crime against nature and provided for a minimum punishment but not a maximum term of years,[2] without criteria for differentiation, creates an inherent unevenness of application, and in this case of a

twenty year old defendant, resulted in a sentence disproportionate to the offense, and thus cruel and unusual.

In *State v. Stephens*, 507 S.W.2d 18 (Mo. banc 1974), a sentence of two hundred years was imposed on a conviction of second degree murder. The defendant contended that such a sentence was cruel and unusual punishment. The court noted that the statute under which the sentence was imposed did not establish a limit to the duration of imprisonment, and thus the 200 year sentence was within the statutory definition. As to the point of primary contention [l.c. 22], the court concluded " 'Constitutional provisions against cruel and unusual punishment are aimed primarily at the kind of punishment imposed, not its duration.' " We are bound by that authority. The point is denied.

The next contention is that G.D. was incompetent as a witness because he did not evince a memory sufficient to retain an independent recollection of the observations made at the time of the criminal events alleged. The defendant bases the contention on § 491.060, RSMo 1969 which provides that a child under the age of ten years of age shall be incompetent to testify if he "appears incapable of receiving just impressions of facts respecting which [he is] examined, or of relating them truly". The effect of the statute renders a child of such years presumptively incompetent as a witness and casts the burden to prove capacity upon the party who offers the testimony. *State v. Anderson*, 252 Mo. 83, 158 S.W. 817, 821[8] (1913); and *Hildreth v. Key*, 341 S.W.2d 601, 609[19] (Mo.App.1960). This statutory standard has been construed to require the proof of four components for competency. *Burnam v. Chicago Great Western R. Co.*, 340 Mo. 25, 100 S.W.2d 858 (1936), [l.c. 862]:

2. MAI–CR construes statutes [such as crime against nature § 563.230] which impose a minimum term of years but no limit to the term of imprisonment to provide for a maximum punishment of life imprisonment. [See: the dissent of Finch, J., joined by Seiler and Bardgett, JJ. in *State v. Stephens, infra* ]. Accordingly, Counts III and IV properly submitted [in the terms of CR 12.50]:

> If you do find the defendant guilty . . . of the abominable and detestable crime against nature you will fix his punishment by imprisonment . . . for a term fixed by you of not less than two years nor more than life imprisonment.

The defendant does not here contend that the term of 150 years imposed on each count was not responsive to each such submission as in excess of a life term.

(1) Present understanding or intelligence to understand, on instruction, an obligation to speak the truth; (2) mental capacity at the time of the occurrence in question truly to observe and to register such occurrence; (3) memory sufficient to retain an independent recollection of the observations made; and (4) capacity truly to translate into words the memory of such observation.

■ The trial judge conducted an evidentiary hearing on the competency of G.D. to give his testimony and ruled in favor of his capacity to testify. The defendant contends evidence by the State did not rebut the presumption of the incompetency of the witness, but rather that the voir dire examination established that G.D. did not display a memory which had sufficiently retained an independent recollection of the observations he made. In the determination of this issue, the rule is clear that it is given to the trial judge to determine the competency of an infant offered as a witness, and his decision is not open to review unless a clear abuse of judicial discretion appears. *State v. Starks*, 472 S.W.2d 407, 408 (Mo.1971).

The defendant points to inadequacies and conflicts in the voir dire testimony on his competency: G.D. responded to questions by the State that he recalled most of what happened to him; that two men picked him up in the car and that then there were four men in the car; he did not recall where they took him, but remembered that he was examined by a physician later that night at Mercy Hospital and that he viewed a lineup at the police station. On cross-examination he answered he did not remember what the men looked like, nor the color of the car; that he remembered what had happened to him that night, but that it was not always so, that he remembered again "when I saw the men again"—and that no one had aided his renewed recollection. On the other hand, the defendant read as trial evidence, the deposition testimony of G.D. which included:

Q. Did the policeman tell you if you said certain things, your story would be better?

A. Yeah.

Q. What did he tell you? Did the policeman tell you to say that these men had stuck something in you?

A. Yeah.

The witness did not recall these deposition questions.

■ The purpose of the statute is to protect an accused from the testimony of a child of tender years who may lack the capacity to truthfully and accurately relate an event previously observed. *State v. Parton*, 487 S.W.2d 523, 525[1–4] (Mo.1972). The determination of testimonial competency of a child rests on the whole of his testimony [*State v. Obie*, 501 S.W.2d 513, 515[5, 6] (Mo.App.1973)], and his voir dire need not be altogether consistent before he will qualify to testify at the trial. In *State v. Price*, 513 S.W.2d 392 (Mo.1974), an eleven year old who witnessed a murder was competent to testify although her voir dire responses evinced a lack of recollection as to her deposition testimony, where her trial testimony demonstrated an independent recollection of the events about which she was to testify.

*Hildreth v. Key*, 341 S.W.2d 601 (Mo.App. 1960) contains a compendium of decisions on the subject and concludes the significant fact [l.c. 611]:

[T]hat in most of the Missouri cases in which the testimony of a child witness has been received, such testimony has pertained either to a crime (usually a sex offense) committed upon the person of the child witness or to an accident in which the child witness has been injured, and thus "about a subject that would naturally leave an impression of a much more lasting character than if it were something that he merely saw or observed".

This logic was followed in *State v. Parton*, 487 S.W.2d 523, 525[1–4] (Mo.1972) where the court found a six year old rape victim competent to give her testimony.

■ It must be conceded that the testimony of G.D. often listed according to the bias of the question. His evidence of the

abduction and oral molestations, however, was not ambiguous. His recollection that his captors forced him to disrobe, bathe, then staked him to the bed and abused him, was clear. These were the impressions of a young boy who was subjected for hours to vile and humiliating abuse against his person. However, his total testimony may have been contradicted on cross-examination, the substance of his evidence was corroborated in almost every particular by other prosecution evidence and by that given by Jerry Dayton for the defendant. The record supports the judgment of the trial court that the testimony of the child witness was on an independent recollection of the observations made at the time of the events.

 We sustain the contention of the defendant that the conviction under Count III was on a submission without support in the evidence, and reverse and remand for the retrial of that issue. We accept review under Rule 27.20(c) because a conviction which does not rest on substantial evidence denies a defendant fundamental fairness and is a manifest injustice. *State v. McClunie*, 438 S.W.2d 267, 268[1, 2] (Mo.1969); *Thompson v. City of Louisville*, 362 U.S. 199, 206[1, 11], 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

Count III of the information in lieu of indictment charged that

> SAM DAYTON . . . did then and there unlawfully, wilfully, either alone or knowingly acting in concert with others and wickedly and against the order of nature, commit the abominable and detestable crime against nature by then and there inserting the penis of him, the said SAM DAYTON into the mouth of G... D...

In fact, there was no proof that it was the sexual organ of the defendant which was placed into the mouth of the boy. As we noted in the companion opinion, the evidence of G.D. was that when he was in the bathroom separated from D.E., one of the men came in and told G.D. to take his penis into his mouth, which G.D. did. This act was repeated upon the direction of another

man. The boy could not give the identity of either man. D.E. did not know what happened to the other boy during their separation, and the defendant disclaimed any involvement at all.

Instruction No. 6 directed a conviction on Count III if the jury found beyond a reasonable doubt that "the defendant, either alone or knowingly acting in concert with others, inserted his penis into the mouth of G... D...". There was no evidence whose organ consummated the perversion. Instructions in a criminal case must rest on substantial evidence, otherwise the conviction rests on conjection and must be set aside. *State v. Cole*, 377 S.W.2d 306, 307[1, 2] (Mo.1964); *State v. Lemon*, 504 S.W.2d 676, 681[3, 4] (Mo.App.1973); *Thompson v. City of Louisville*, 362 U.S. 199[1], 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

It is the contention of the State that the defendant was properly found guilty on Count III as an accomplice, since there was substantial evidence that he aided and abetted the conduct charged and the jury was properly directed by Instruction No. 12:

> All persons are guilty who knowingly act together with the common purpose of committing an offense, or who knowingly and intelligently aid or encourage another in committing it, and whatever one does in furtherance of the offense is the act of each of them.

There is no doubt that there was sufficient evidence for conviction *upon proper instruction* that the defendant aided and abetted the oral sodomy practiced upon G.D. When Instructions Nos. 6 and 12 are read together, as they must be, they can only mean that the defendant by himself or with the help of others inserted his penis into the mouth of the boy. The finding of either alternative rests on evidence that the phallus of the defendant himself was the means by which the offense was committed. There was no such proof and confusion resulted. The jury interrupted deliberations to express their quandary by this written inquiry to the court:

> Confused: Instruction No. 6—under Count No. 3, is he guilty only if he actual-

ly inserted in boy's mouth—or does the act of merely being present possibly make guilty like in Instruction No. 12?

The court responded that the instructions were to be read all together, and returned the jury to their deliberations.

Counts I, II and IV are affirmed; Count III is reversed and remanded for a new trial.

All concur.