THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GENE LOVITZ, Defendant-Appellant.

Second District (1st Division)    No. 74-335

Opinion filed June 28, 1976.

Wayne B. Giampietro, of Gertz & Giampietro, of Chicago, for appellant.

John J. Bowman, State's Attorney, of Wheaton (Malcolm F. Smith, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE HALLETT delivered the opinion of the court:

Following a trial by jury, the defendant was convicted of murdering his wife and sentenced to not less than 14 nor more than 45 years in the penitentiary. He appeals, contending: (1) that the trial court erred in denying his motion to suppress physical evidence; (2) that he was denied a speedy trial; (3) that the evidence failed to prove him guilty beyond a reasonable doubt; (4) that the trial court erred in not instructing the jury that the evidence must exclude every reasonable theory of innocence; and (5) that the trial court's failure to grant a new trial was erroneous in light of newly discovered evidence. We find no merit in any of these contentions and affirm.

At a preliminary hearing to suppress evidence, Officer James Mullany of the Glen Ellyn Police Department testified for the State that on the morning of August 19, 1973, he was working the radio desk at the station when he received a telephone call from an Officer Bruski of the Chicago Police Department. Bruski stated he had information that a Eugene Lovitz had killed his wife in Glen Ellyn, that the killing had taken place two days before, that the woman "must be lying dead" somewhere in Glen Ellyn, and that Eugene Lovitz was "going to skip town with their two year old child." Upon receiving this information, Mullany made a search of the department records and arrest files but failed to find the name Eugene Lovitz. At 2:17 p.m. on the afternoon of the same day, Mullany received a second call with reference to the same information, this time from an unidentified caller. In addition to corroborating Burski's statement, the second caller mentioned the name Donna Lovitz and informed Mullany that Eugene Lovitz was the manager of an apartment complex somewhere in Glen Ellyn. With this additional information, Mullany located the address of an apartment registered to a Eugene and Donna Lovitz, and three members of the Glen Ellyn Police Department proceeded to 17 North Main Street, Glen Ellyn, where they were joined by an Assistant State's Attorney. They observed the name Lovitz on the mailbox of apartment 1A. The apartment was locked, all the drapes were drawn, and there was no response to repeated knocking on the door. One of the officers walked to the rear of the apartment and noticed numerous flies between the curtain and the window in one of the rooms.

The police opened the front door with a pass key obtained from the assistant manager of the complex, and, upon entering the living room, detected an odor of decaying flesh. They proceeded into a bedroom where they discovered a large object on the floor covered with a bedspread, some sofa cushions, two lawnchairs, and a bag of Christmas ornaments. The object was the body of a partially nude female, later identified as the wife of Eugene Lovitz. They proceeded to look around the apartment and discovered numerous articles in plain view which were

later admitted at the trial as exhibits.

On August 23, four days after the body was discovered, the defendant voluntarily surrendered to the F.B.I. in Biloxi, Mississippi, stating that he thought he was wanted in Illinois for shooting his wife. At that time he made a statement to the arresting officers and turned over the gun later determined to be the murder weapon.

On August 25, 1973, the defendant was returned to Illinois, and on November 15, an indictment charging him with three alternative counts of murdering his wife was handed down by the Grand Jury. On April 3, 1973, the defendant was brought to trial and the State outlined the discovery of the body described above. The pathologist who performed an autopsy on Donna Lovitz's body testified that he removed a bullet from a contact wound located in the right rear of the skull about three inches behind the ear.

The defendant's own testimony placed the time of death sometime early on the morning of August 17, 1973, and there was no contrary testimony on this point. John Rehs, a process server for the Du Page County sheriff's office, testified that at approximately 11:30 a.m. on August 17, 1973, he went to the defendant's apartment to serve a summons for eviction. The defendant came to the door and accepted service. Also on August 17, between 11 a.m. and 12 p.m. a letter carrier delivered a certified letter to the defendant's apartment and the defendant signed for it personally.

Shirley Lovitz, the defendant's ex-wife, testified for the State that on the afternoon of August 17, the defendant and his two-year-old daughter were at her house when she returned home from work around 4 in the afternoon. He told her that his wife was dead and that he wanted her to take care of his daughter. When Shirley became upset and asked if he was "kidding," the defendant replied that he was "kidding" and Shirley left to go grocery shopping. When she returned, the defendant and his daughter had gone.

The next afternoon, the defendant returned and told Shirley that Donna was dead and that her death was an accident. Their 22-year-old son Bryant was home at the time and he and the defendant drove off together. They returned to Shirley's home late that evening and Shirley told them to "get out." They left together and Bryant was still with his father when they surrendered to the F.B.I. four days later in Mississippi.

Deborah Gaylord testified that at approximately noon on August 18 the defendant came to her home and asked her to take care of his two-year-old daughter for a few days while he took his wife up to Wisconsin to "sober up." She took the child from his car and he indicated he would return for her the following Tuesday.

The defendant took the stand in his own behalf and offered a story of

self-defense and accidental death. He stated that on August 17, 1973, he and his wife had been drinking heavily since the afternoon of the preceding day and that an argument ensued as his wife reached a "final plateau of drunkenness." He testified that she went into the bedroom and returned with a loaded gun. She threatened to kill him and their daughter and when he attempted to leave the apartment she blocked his path to the door. They struggled, and in an attempt to take the gun from her it discharged and the bullet struck her in the head. Realizing immediately that she was dead, the defendant dragged her body into the bedroom and covered it so that their two-year-old daughter wouldn't see her mother dead.

The defendant then lay on the couch in a daze and contemplated suicide until the process server knocked on the door and brought him to his senses. He said nothing about the death to the process server or the mailman who followed shortly with the certified letter because he felt that neither of them could handle the situation. The defendant maintains that he intended to call the police, but that he didn't want his daughter taken to a police station and in his dazed condition he was unable to cope with the terrible situation.

There was testimony that the evening of the day that Donna Lovitz died, the defendant picked his car up at the repair shop, and the following morning, he went to his place of employment to pick up his check book so that he could cash a check for gasoline money.

The defendant testified that after Shirley told them to leave her house, he and his son Bryant drove around while he debated between suicide and going to the police. They abandoned their car the following week in New Orleans and then called the F.B.I. in Biloxi. When he gave a statement to the arresting officers on August 23, the defendant stated that his son had been present and had actually witnessed the accidental death of Donna Lovitz. The following day, his son Bryant gave a similar statement which corroborated the one given by his father.

At trial, the defendant admitted he lied about his son's presence, but he had done so because his son told him he was going to tell the police he witnessed the accident. Bryant testified at trial that he lied and that it was his idea to provide his father with some corroboration despite his father's wishes that he not become implicated.

After hearing the evidence, the jury returned a verdict of guilty and the defendant has appealed.

■■ The defendant first contends that the police entry into the apartment without a search warrant and the subsequent seizure of physical evidence therein constitutes a violation of his rights under the Fourth Amendment to the United States Constitution. He moved for the suppression of physical evidence at a preliminary hearing and his motion was denied.

Unquestionably, most of the State's physical evidence resulted from the initial entry and subsequent search of the defendant's apartment which was conducted without benefit of a search warrant. Generally speaking, the entry and search of a private dwelling without a warrant is constitutionally prohibited except under circumstances where the police are confronted with an emergency which dictates the need for immediate action. While the defendant cites cases dealing with the exclusionary rule and the type of information upon which a warrant may issue, he neglects the exigencies of the situation in the instant case. The search in this case was incidental to the investigation of a "dead body" report that a woman "must be lying dead somewhere in their city" and her husband was going to "skip town with their two year old child." In discussing this type of emergency situation, the Supreme Court of Delaware stated: "As a general rule, we think, an emergency may be said to exist, within the meaning of the 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have, occurred. And the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact." *Patrick v. State* (1967), 227 A.2d 486, 489.

The investigating police in the instant case located the apartment in question, discovered the locked door, and observed the flies in one of the rooms. At this point, acting on the information that a woman must be dead and a two-year-old child might be in danger, it became incumbent upon the police to take all reasonable steps to investigate the possibility that someone in the apartment was in need of immediate assistance. The availability of a pass key presented a reasonable and speedy method of ascertaining the status of the information given to the police which created in their minds this need for immediate action. In *People v. Brooks* (1972), 7 Ill. App. 3d 767, 289 N.E.2d 207, the Illinois Appellate Court's First District examined the propriety of a search similar to the one in question. In that case, the police were summoned to an apartment building by a janitor who expressed concern over the unusual and unexplained absence of one of his tenants. Both the janitor and the investigating police noticed an odor in the hallway which they identified with the presence of a dead body. They immediately entered the apartment without obtaining a search warrant and discovered a body under a pile of clothing and blankets. Following this discovery, they made a search of the apartment and obtained as evidence articles which were in their plain view. In upholding this search as reasonably incident to the investigation of an emergency situation, Mr. Presiding Justice Goldberg stated at page 776 in that opinion: "[I]mmediately prior to their entry, the police did not know what would confront them upon entry to the premises. The missing person may have been found severely injured

under intolerable circumstances. The odor may have been caused by the rotting flesh of a living person after severe burns or injuries. The very uncertainty created by the totality of all the circumstances created a justification, and actually a need, for the police to take immediate action." In addition to citing *Patrick*, Justice Goldberg went on to quote the explicit language of Mr. Justice Burger in *Wayne v. United States* (D.C. Cir. 1963), 318 F.2d 205, where he stated at page 212:

"* * * The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response."

In the instant case, the search of the apartment was carried out as expeditiously as possible, and such a search is justified—not to obtain evidence of some crime, but rather as an attempt to offer assistance to a citizen who might be in peril. When entering the apartment, the police had no way of knowing the reality of the situation regarding the deceased and her two-year-old daughter. An immediate investigation was necessary.

■■ The policy reasons behind the exclusionary rule are not intended to be carried to such an extreme that they require the police to delay their investigation of situations potentially perilous to the citizens they have a duty to protect. The entry into the apartment and the subsequent seizure of articles in plain view did not constitute a violation of the defendant's rights, and the trial court was correct in denying defendant's motion to suppress the evidence discovered as a result of this entry and search.

The defendant next contends that he was denied his right to a speedy trial and cites section 103—5 of the Code of Criminal Procedure (Ill. Rev. Stat. ch. 38, par. 103—5), which provides: "Every person in the custody of the State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant * * *."

■■ While the defendant admits that his own continuance put the trial beyond the 120-day period, he maintains that the State forced him into the position of requesting the continuance by delaying the indictment and discovery procedures. The record indicates that the defendant was taken into custody, for purposes of this 120-day limitation, on August 25,

1973, when he was returned to Illinois. *People v. Hayes* (1962), 23 Ill. 2d 527, 179 N.E.2d 660.

Trial was set for December 4, at which time the State produced their answers to discovery and their answers to defendant's bill of particulars. At that time, the attorney for the defendant stated that he could not possibly proceed to trial until he had examined the information produced by the State. There were 18 days remaining in the initial 120-day period and the judge apprised the defendant of this fact. Nonetheless, the defendant requested a continuance to January 8, 1974, two weeks after the initial 120-day period had expired. The defendant cites *People v. Shields* (1974), 58 Ill. 2d 202, 317 N.E.2d 529, in which the Supreme Court ruled that the State had violated the defendant's right to a speedy trial by demanding discovery information instanter from the defendant's attorney who had been appointed only seven days before the expiration of the statutory period. In that case, it is clear that the defendant was entitled to a reasonable time to produce the answers required, and that such a necessary delay should not be charged against the defendant. However, as the Supreme Court pointed out in *People v. Fosdick* (1967), 36 Ill. 2d 524, 529, 224 N.E.2d 242: "In the varied fact situations that involve the 120-day rule, we have carefully examined the facts to prevent a 'mockery of justice' either by technical evasion of the right to a speedy trial by the State, or a discharge of a defendant by a delay in fact caused by him."

■■ The facts in the case now before us establish that the State had complied with the defendant's production order, and in fact was ready to go to trial 18 days before the expiration of the 120-day period. Contrary to defendant's assertion, there is nothing in the record to indicate that the State intentionally delayed either the indictment or the discovery procedures in order to prejudice the defendant's rights to a speedy trial. In a case of this nature, where the State examined 64 witnesses, and conducted a number of scientific studies, it is reasonable to expect that the discovery proceedings will be lengthy. The record fails to reflect any bad faith on the part of the State, and, in fact, the State complied with the defendant's production order 11 days after it was issued. In addition, they argued two defense motions and prepared an answer to the defendant's Bill of Particulars during this period in an effort to hasten discovery as the 120-day period drew near its end. The State was ready to go to trial 18 days prior to the expiration of the statutory period. While it was reasonable for the defendant to delay long enough to examine the information produced by the State, the defendant still had 18 days in which to go to trial within the 120-day period and yet voluntarily had the case continued to a date nearly five weeks later. Such a delay must be charged against the defendant and tolled the running of the 120-day period.

■■ The defendant next contends that the State failed to produce evidence establishing his guilt beyond a reasonable doubt.

It is well settled that it is within the power of this court, on review, to consider the evidence, and, if taken as a whole, it does not establish guilt beyond a reasonable doubt, to reverse the conviction.

The defendant maintains that the circumstantial nature of the State's case cannot, as a matter of law, refute the defendant's version of self-defense. In support of this theory, the defendant refers us to *People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651. There, a woman's conviction for the voluntary murder of her husband was overturned because the State was unable to produce evidence to refute the defendant's story of self-defense. Virtually, all the evidence presented in that case consisted of four inconsistent statements made by the defendant herself as to how her husband's death occurred. In addition, the State offered evidence of the defendant's flight and testimony about the severity of the deceased's injuries to refute the theory of self-defense and sustain the verdict of manslaughter.

Unlike *Lewellen*, in the instant case, the State offered substantial evidence, both circumstantial and direct, to allow the jury to conclude that Donna Lovitz died as a result of an act of the defendant, and not accidentally, as his story indicates.

The defendant argues that his version of his wife's death is uncontroverted by the evidence and in fact is reasonable in light of the evidence produced.

Before the jury may determine the reasonableness of a witness' testimony, they are expected and in fact instructed to determine the credibility of the witness. If the witness is not credible, then it makes no difference that his testimony is reasonable. A well-conceived fiction may be moulded to fit available evidence. The transcript in the present case is replete with testimony that the defendant lied to various witnesses about the circumstances surrounding his wife's death and it is possible that the entire content of his testimony was disregarded by the jury. The defendant contends that, without his own testimony, the State has no evidence to support a conviction at all. This is simply not so. Without going into all of the evidence contained in the 2073 pages of the trial transcript, we note the following facts which are established by evidence independent of the defendant's testimony. The defendant was present in the apartment at the time his wife's death occurred. She was shot by a gun belonging to the defendant and found in the defendant's possession when he surrendered to the police. On at least two prior occasions, he had publicly waved a pistol at his wife. The defendant fled the scene of the crime and admittedly lied to numerous people including the F.B.I. agents about the facts surrounding his wife's death.

Both sides offered scientific evidence as to the deceased's condition at the time she was shot. The defendant maintains his wife was in a drunken rage, and the State offered evidence that she was not even intoxicated.

While it is true that a good deal of the State's case consists of circumstantial evidence, it is also true that crimes of violence more often than not take place behind closed doors and out of the view of direct eyewitnesses.

We conclude that the evidence established the defendant's guilt beyond a reasonable doubt.

■■ The next issue raised by the defendant is the failure of the trial court to include the following sentence in its instruction to the jury on circumstantial evidence:

> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

This sentence appears in brackets following Illinois Pattern Jury Instruction—Criminal No. 3.02. The committee notes on use of this instruction indicate that the sentence in brackets "should be given only when proof of guilty is *entirely* circumstantial." After reviewing the record, it is apparent that, while a large portion of the evidence presented by the State is circumstantial, there is enough direct evidence to preclude giving this instruction. The trial judge was correct in submitting the instruction without the bracketed material.

■■ Finally, the defendant contends that the trial court abused its discretion by refusing to grant his motion for a new trial on the basis of newly discovered evidence. This motion was based upon the appearance of a witness, Marie Charles, who allegedly was not known to the parties at the time of trial.

In a post-trial hearing, the judge held a hearing and personally listened to the testimony of this proposed witness, after which he denied the defendant's motion. The new testimony concerned the decedent's state of intoxication on the evening before her death and was offered to rebut the testimony of the State's toxicologist who had testified at trial that in his opinion the decedent was sober at the time of death.

Applications for a new trial on the ground of newly discovered evidence are looked upon with disfavor by the courts and are subject to close scrutiny. (*People v. Miner* (1974), 17 Ill. App. 3d 661, 307 N.E.2d 624.) To warrant a new trial, the newly discovered evidence must be of such a conclusive character that it would probably change the result on retrial. In *People v. Holtzman* (1954), 1 Ill. 2d 562, 569, 116 N.E.2d 338, our Supreme Court stated:

> "[T]he burden is upon the applicant to rebut the presumption that the verdict is correct and to show that there has been no lack of

diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in cases of manifest abuse * *· *."

We conclude that the so-called newly discovered evidence was not of such a character and that the trial court did not abuse its discretion in denying the defendant's motion for a new trial.

The judgment therefore is affirmed.

Affirmed.

GUILD, P. J., and SEIDENFELD, J., concur.