STATE of Missouri, Respondent,

v.

Russell Lee EPPERSON, Appellant.

No. 60308.

Supreme Court of Missouri,
En Banc.

Sept. 12, 1978.
Rehearing Denied Oct. 10, 1978.

David V. Bear, Columbia, for appellant.

John D. Ashcroft, Atty. Gen., Paul R. Otto, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Defendant Russell Lee Epperson was convicted on three counts of murder in the first degree for killing his wife Fern and their two children, Richard and De Ann. The jury assessed punishment on each count at life imprisonment and the court ordered that the sentences run consecutively.

On appeal, defendant contends that evidence used against him in the prosecution of the case was obtained during a warrantless search of his home by members of the municipal police force of the City of Mexico, Missouri, in violation of his rights under the Fourth Amendment to the Constitution of the United States and Art. I, § 15 of the Constitution of the State of Missouri. This contention turns on the answers to the following questions: (1) Was there an emergency situation justifying the warrantless entrance of defendant's house by the police which led to the discovery of the bodies? (2) Can the initial entry and discovery be justified only by the *subjective* rationale and beliefs of the searching police officers or may it be based upon the *objective* facts known to the police officers and the logical deductions based thereon? (3) Was the additional warrantless search of the defendant's home immediately after the police had found the bodies of the three missing persons and ascertained that the defendant probably was not present, justified by the exigencies of the situation?

Appeal was taken to the Court of Appeals, St. Louis District, which, in an opinion suggesting affirmance, determined that resolution of the issues involved an original construction of the Fourth Amendment to the Constitution of the United States and Art. I, § 15 Mo.Const.1945, and thus fell within the exclusive jurisdiction of this Court under Art. V, § 3, Mo.Const., as amended 1970. See *City of St. Louis v. Tinker*, 542 S.W.2d 512, 513[1] (Mo.banc 1976). Accordingly the Court of Appeals, without rendering a final decision, ordered the case transferred here. Portions of the well reasoned Court of Appeals' opinion have been utilized without quotation marks.

Defendant Epperson and his wife, Fern, lived with their two small children at 608

West Pearson, Mexico, Missouri. On Monday, March 24, 1975, Fern's mother, Mrs. Mary Ann Smith, attempted unsuccessfully to telephone her daughter at the Epperson home. Mrs. Smith then called defendant at his place of employment and inquired concerning the whereabouts of her daughter. He told her that Fern and the children had gone to Columbia to do some shopping, which Mrs. Smith considered strange as Fern usually left the children with her when shopping.

The next day, March 25, Mrs. Smith again tried calling her daughter at home but received no answer. That evening she and her husband saw Epperson on the town square in Mexico and he told them Fern was with his mother. However, when Mrs. Smith informed him that she knew Fern and the children were not with his mother Epperson said that he did not know where they were. After Mrs. Smith returned home she received a call from Epperson who told her that Fern had telephoned and said she would be home in the morning with the children.

On March 26, at approximately 8:30 a. m., Epperson again called Mrs. Smith and asked her to come to his house. At first she refused but when he told her that Fern would be there about 9:00 a. m. she agreed to go. At 8:45 a. m. appellant picked up Mrs. Smith in his truck and took her to his home. As she and the defendant went into the house he removed something from a cabinet, keeping it behind him while he locked the outside kitchen door. He stood against the door facing Mrs. Smith, keeping his left hand behind him and told her she should go into the front room and sit down. He also told her several times that "I'll sure be glad to get this all over." Mrs. Smith saw her daughter's purse on the clothes dryer in the kitchen and knowing that whenever her daughter left the house she took her purse with her, she became quite suspicious. At that time she also detected an odor in the house which, from prior experience, she associated with death. After making the excuse that she had some food in the oven at her home Mrs. Smith left the Epperson residence and went to the

home of a neighbor, Mrs. Mitchell, and placed a call to the Police Department of the City of Mexico. Officer Schnidler, responding to that call, met Mrs. Smith at the Mitchell house where she related the matters that had occurred. Schindler promptly summoned Sergeant Duffner and relayed this information to him.

Both officers immediately went to the Epperson home and finding all of the windows were covered with drapes or blinds, knocked on the doors without response. Ordering Schindler to remain near the house to observe if anyone left or entered, Sergeant Duffner walked next door to the home of Epperson's neighbor and through a series of calls obtained information as to Epperson's place of employment and that of his wife, as well as the school in which Richard was enrolled. He learned that Fern Epperson had been on vacation that week but had not kept her usual Tuesday evening bowling date. From defendant's employer he found that defendant had stated the day before that he had taken his wife to the hospital for x-rays but a call to the family doctor revealed that he had not seen Mrs. Epperson since December of 1974 and Mrs. Smith had informed him that the hospital had no record of Fern reporting for x-rays. School personnel where Richard was enrolled told Sergeant Duffner that Epperson had called the school the day before and told them that his son Richard would be absent because of illness. Following a conference with the Chief of Police, Duffner was ordered to determine from Epperson's parents whether they had seen him and request that the parents come to the house.

The parents agreed to this suggestion and met the officers at the Epperson home where, again, knocking on the doors produced no response. Epperson's father pointed out that his son's motorcycle was not there and surmised he might be elsewhere riding it. However, the motorcycle was located at Epperson's place of employment but he could not be found. The parents then told the officers they would not break into their son's house and they then went to the home

of the neighbor where Mrs. Smith was waiting. Nevertheless the father, accompanied by the two officers, again went to the home and the officers told the father that he should be the one to enter the house. He eventually agreed to assist and after unsuccessfully trying to open the doors, a storm window was removed and an unlocked bedroom window opened. Duffner assisted the father in raising the window and a ladder was placed against the side of the building, the blinds were pulled back and the father and two police officers entered a bedroom of the house.

When they pulled back the blinds they saw what was apparently a human form lying under a sheet on the bed. While Schindler and Epperson's father went to the other parts of the house to see if anyone else was there Sergeant Duffner removed the sheet and discovered the bodies of Mrs. Epperson and the two children. The children had plastic bags over their heads and the son had a cord around his neck. Each showed signs of violent mistreatment. There was a sock in the bag over the daughter's head and another sock was near the wife's face. When the others returned to the room where the bodies were found, Duffner called his superior officers and then made an investigation of the house. As he walked through the house he saw a five gallon can of gasoline in the hallway near the bedroom, a chisel for an air hammer partially wrapped in towels in a chair in the living room and a bottle of chloroform on the top of the sewing cabinet in the kitchen. Later during an autopsy it was determined that blows by a blunt instrument had been inflicted on the victims and chloroform was found in their vital organs. Epperson, who could not be found, became the subject of an intensive manhunt and was apprehended ten days later.

## I.

Defendant contends that facts known to the police when they broke into the defendant's house were not sufficient to justify the warrantless entry and original search. It first should be noted that by objective standards sufficient facts had been made known to the police to establish probable cause that a crime had been committed. These facts include (1) the defendant's wife and children had been missing several days; (2) defendant had given false and inconsistent explanations for their absence; (3) defendant's unusual, suspicious and nervous manner in the days following the disappearance of his family; (4) an odor of decomposing flesh had been detected in the house, and (5) defendant's unexplained disappearance, though he had been in the house with Mrs. Smith shortly before the police arrived.

▮ The question we first must decide is whether the facts were sufficient to establish exigent circumstances justifying a warrantless entry of the house. In general, an entry and search without a warrant are deemed unreasonable under the Fourth Amendment to the Constitution of the United States unless the action falls within certain carefully delineated exceptions. *United States v. U. S. District Court*, 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). The burden is on the State to show an exception exists. *Coolidge v. New Hampshire, supra*, 403 U.S. at 455, 91 S.Ct. 2022; *Vale v. Louisiana, supra*, 399 U.S. at 34, 90 S.Ct. 1969. Among the exceptions are searches incident to a valid arrest, searches of cars stopped on a road, seizures of evidence in plain view, stop and frisk searches, searches with consent, searches to prevent destruction of evidence, searches to prevent the flight of a criminal, and searches in response to a need for help. See *Coolidge v. New Hampshire, supra*, 403 U.S. at 455–473, 91 S.Ct. 2022; *Vale v. Louisiana, supra*, 399 U.S. at 34–35, 90 S.Ct. 1969; *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Warden v. Hayden*, 387 U.S. 294, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Chapman v. United States*, 365 U.S. 610, 615, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

The State contends that the entry and search fall within the "need for help" or the "emergency" exception, claiming that the odor of death combined with the long, unexplained absence of defendant's wife and children, defendant's suspicious behavior and his disappearance at the time of the search, gave probable cause to believe there was a medical emergency in which someone might be ill or injured and in need of immediate help. The State also urges these facts constituted probable cause to believe a crime has been committed *and* raised the possibility that a victim might be in need of assistance or medical aid which also justified the warrantless search.

The Supreme Court of the United States has held a warrantless search was reasonable in an emergency situation when a police officer heard a shot and a cry for help. *McDonald v. United States*, 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153 (1948). For a discussion of the emergency doctrine and its history see *State v. Sutton*, 454 S.W.2d 481 (Mo.banc 1970). Because of the circumstances of the case, the search in *Sutton* was subsequently ruled unconstitutional in *Root v. Gauper*, 438 F.2d 361, 365 (8th Cir. 1971), but in *Root* it was recognized that Missouri had "the prerogative" to accept that doctrine, and we reaffirmed our adoption of the emergency exception in *State v. Miller*, 486 S.W.2d 435 (Mo.1972). See also *Wayne v. United States*, 115 U.S. App.D.C. 234, 240–243, 318 F.2d 205, 211–214 (1963).

It has been persuasively stated that whenever the police have reliable information of a death, an emergency exists sufficient to justify an immediate search because apparent death may turn out to be a barely surviving life, still to be saved. *Patrick v. State*, 227 A.2d 486, 489[3–9] (Del. Supr.1967). Here, although the odor of decomposing flesh would indicate death of one of the persons involved, at least three persons were missing under very unusual circumstances and Epperson could not be found. One or more could have been in immediate need of help to prevent death. Many courts have approved searches upon the emergency exception rationale in situations similar to the case before us. See *People v. Brooks*, 7 Ill.App.3d 767, 289 N.E.2d 207 (1972); *People v. Hill*, 12 Cal.3d 731, 117 Cal.Rptr. 393, 528 P.2d 1 (banc 1974); *People v. Clayton*, 34 Ill.App.3d 376, 339 N.E.2d 783 (1975); *People v. Lovitz*, 39 Ill.App.3d 624, 350 N.E.2d 276 (1976); *State v. Pires*, 55 Wis.2d 597, 201 N.W.2d 153 (1972); *Geary v. State*, 91 Nev. 784, 544 P.2d 417 (1975); *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976), cert. denied, 426 U.S. 953, 96 S.Ct. 3178, 49 L.Ed.2d 1191.

■ *People v. Brooks, supra*, concerned facts remarkably similar to those at bar. There the victim and defendant, who were mother and son, lived together in the mother's apartment. Friends of the victim were unable to contact her for several days and when they questioned defendant concerning her whereabouts they received incredulous answers. After the janitor of the victim's apartment building noticed an odor of death in the place, he contacted the police. Upon arrival, the police detected a strong "odor of death," entered the victim's apartment and discovered her body in the living room. The Illinois Court upheld the *entry and subsequent search* of the apartment as a reasonable response to an emergency situation. We hold that the exigent circumstances presented by this record justified the entry and original search of the house as "reasonable" under the Fourth Amendment to the United States Constitution and Art. I, § 15, Mo.Const., 1945.

## II.

The defendant, as further challenge to the entry and search, places great emphasis on the police officers' statement of their subjective belief that no crime had been committed and their somewhat ambiguous statements as to a possible emergency. The State counters with the contention that when the legality of a search is in question the subjective thoughts of the police are not controlling but instead the objective facts within their knowledge and the reasonable conclusions objectively drawn therefrom are determinative.

The Supreme Court of the United States has measured both probable cause and the warrant requirements for searches against objective standards. It has stated that in determining the reasonableness of a particular search, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search *'warrant a man of reasonable caution in the belief'* that the action taken was appropriate?" (Emphasis added.) *Terry v. Ohio, supra,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889. The Court in *Terry* emphasized that subjective good faith alone is not enough; that there must also be objective reasonableness to enable meaningful review by the court.

Many lower federal courts and some state courts have said, sometimes in dicta, that objective reasonableness alone suffices to uphold either an arrest or a search. See *United States ex rel. LaBelle v. LaVallee,* 517 F.2d 750, 754[7–8] (2d Cir. 1975), cert. denied, 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976); *United States v. McCoy,* 517 F.2d 41, 43 n. 1[1] (7th Cir. 1975), cert. denied, 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975); *United States v. Vital-Padilla,* 500 F.2d 641, 644[2] (9th Cir. 1974); *White v. United States,* 448 F.2d 250, 254[5] (8th Cir. 1971), cert. denied, 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972); *Sirimarco v. United States,* 315 F.2d 699, 702[7] (10th Cir. 1963), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1032 (1963); *State v. Donnell,* 239 N.W.2d 575, 578[6] (Iowa 1976); *Commonwealth v. Miller,* 366 Mass. 387, 318 N.E.2d 909, 911[4] (1974); *Commonwealth v. Donnelly,* 233 Pa.Super. 396, 336 A.2d 632, 637[5–6] (1975), cert. denied, 424 U.S. 974, 96 S.Ct. 1477, 47 L.Ed.2d 744 (1976). Cases holding that the objective facts were not enough have done so on the basis that the police officers' subjective motives were demonstrably in bad faith. See *Mills v. Wainwright,* 415 F.2d 787, 790[1] (5th Cir. 1969); *Moss v. Cox,* 311 F.Supp.

1245, 1251–52[13–15] (E.D.Va.1970). Contra *United States v. Dunavan,* 485 F.2d 201, 205[4–6] (6th Cir. 1973). This is not a problem here as the officers in good faith were searching for persons missing under unusual circumstances rather than to harass the defendant or entering to search for evidence linking him with a crime.

■ Furthermore, the officers' testimony reveals that though they may have considered this a "missing persons" investigation they also considered the medical emergency factors involved. In response to the question why he did not get a search warrant Sergeant Duffner testified:

> Well, I really didn't know what I had. I didn't know—I knew the circumstances, that Russell Epperson and his wife were gone, and as far as I was concerned, I was just looking to try to find them to see if they had skipped the country or *they were injured* or what. I didn't really know what I had. I mean there was no indication further to my prior investigation of any foul play involved of [sic] anything. As far as I knew they were just gone wherever they went; I couldn't tell. (Emphasis ours.)

From this response it appears the officer in charge of the search considered the probability that someone in the house might be injured and need medical aid. By an objective standard there are sufficient facts to justify the officers' initial entry into defendant's home, despite the ambiguous testimony as to their subjective belief.

■ Following the entry under the emergency doctrine, the officers could seize evidence of the crime in the bedroom under the theory of "plain view," [1] if such evidence was readily observable and was discovered inadvertently rather than by anticipation or by a concerted search, and was immediately recognized as evidence of a crime. *Coolidge v. New Hampshire, supra,* 403 U.S. at 465, 91 S.Ct. 2022; *State v. Dayton,* 535 S.W.2d 479, 486[6–8] (Mo.App.

---

1. The Supreme Court of the United States has stated, "Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971).

1976). Here, following the officers' permissible warrantless entry through the window of the bedroom, they could properly pull back the sheet to see if the form observed on the bed was that of a living person. It is then that evidence, such as the bodies, cord, socks and plastic bags came into "plain view," which the police immediately recognized as evidence of a crime. All such items found in the bedroom, as well as the photographs taken there, were properly admitted in evidence. For similar decisions in other states see *Patrick v. State, supra,* 227 A.2d at 489–90[9–11]. *People v. Brooks, supra,* 289 N.E.2d at 214; *People v. Hill, supra,* 117 Cal.Rptr. at 412, 528 P.2d at 20.

### III.

The admission of evidence from rooms of the house other than the bedroom presents a somewhat different problem and cannot be justified under the plain view doctrine except as they might be said to have been inadvertently discovered during a continuation of the emergency search for injured or missing persons. This evidence was discovered as the result of Sergeant Duffner's search of the rest of the house immediately following the initial search for defendant (a source of potential danger) or other victims by Officer Schindler and Epperson's father. If the evidence had been found moments earlier during Schindler's cursory search, it would clearly have been admissible under the plain view theory. *United States v. Blake,* 484 F.2d 50, 57[7–8] (8th Cir. 1973), cert. denied, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974); *State v. Dayton, supra,* 535 S.W.2d at 484–86[1–4].

However, the evidence adduced at the hearing for the motion to suppress and at trial revealed that the bottle of chloroform, the gasoline can and the chisel were found and the photographs and diagram of the other rooms were made by Sergeant Duffner after he had discovered the bodies of the three missing persons and Officer Schindler had ascertained that neither defendant nor any other victims were in the house.

In *People v. Brooks, supra,* after the police discovered the body of defendant's mother in his apartment following the warrantless entry justified by the emergency exception, they searched the apartment and discovered a bloody rug in the bathroom and a blood splattered shirt in one of the bedrooms. Shortly thereafter other police personnel arrived and photographed the apartment's interior. All of this activity occurred without a search warrant, though upon the discovery of the body defendant became the only suspect. In that case the defendant claimed the search and seizure of physical evidence violated his rights under the Fourth Amendment. However, the Illinois Court justified the initial entry, the immediate discovery of the body, as well as the subsequent search which yielded the rug and shirt by the emergency exception. See also *People v. Clayton,* 34 Ill.App.3d 376, 339 N.E.2d 783 (1975) and *People v. Lovitz,* 39 Ill.App.3d 624, 350 N.E.2d 276 (1976) for remarkably similar fact situations with the same result.

The case of *Michigan v. Tyler,* No. 76–1608, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), is clear authority to render the warrantless entry in the case at bar "reasonable," under the Fourth Amendment to the Constitution of the United States, and having discovered the victims of the crime, to authorize the police to investigate for and seize readily accessible evidence of the crime. In that case defendants were convicted of conspiracy to burn real property in violation of the applicable Michigan statute. Shortly before midnight on January 21, 1970, a fire broke out in the building leased to the defendant, Tyler. The fire department responded, quenched the fire and "was 'just watering down smoldering embers' " when Chief See arrived on the scene about 2:00 a. m. on the morning of January 22. A Lieutenant of the fire department informed the Chief that "two plastic containers of flammable liquid had been found in the building." Using portable lights the Chief and the Lieutenant entered the gutted store which was filled with smoke and steam to examine the plastic containers. They concluded that the fire

" 'could possibly have been an arson,' " whereupon the Fire Chief called police Detective Webb who arrived at about 3:30 a. m. and took several pictures of the containers and the interior of the store. However, they abandoned their efforts to search after the Chief had "[l]ooked throughout the rest of the building to see if there was any further evidence, to determine what the cause of the fire was." By 4:00 a. m. the fire had been finally extinguished and the firemen departed. The Fire Chief and the Detective took the two containers to the fire station where they were turned over to the Detective for safekeeping. They had neither consent nor warrant for the entries of the building nor for the removal of the containers.

About four hours after leaving the premises, Chief See with his assistant returned to the empty building to determine the origin of the fire and examine for arson. After a cursory inspection they left but at about 9:00 a. m. that morning the Assistant Chief and Detective Webb returned to the building looking for evidence of arson and they discovered suspicious burn marks in the carpets which Webb could not see earlier that morning because of the heat, steam and darkness. They also found pieces of tape, with burn marks, on the stairway. After leaving the building to obtain tools they returned and removed pieces of the carpet and sections of the stairs to preserve these bits of evidence suggestive of a fuse trail. The Assistant Chief also searched through the rubble "looking for any other signs or evidence that showed how this fire was caused." l. c. 502, 98 S.Ct. l. c. 1946. Again, there was neither consent nor warrant for these entries and seizures. Both at trial and on appeal the defendants objected to the introduction of evidence obtained during these searches. Thereafter other investigators entered the premises on January 26 and 29, and again on February 16 to gather evidence concerning the charge of arson and the cause of the fire.

The Court held that Fourth Amendment protection extends to entries by officials, whether they be building inspectors, police, representatives of the health department, firemen or others. That such entries are permissible only on proper warrants or with consent or if exigent circumstances occur of sufficient proportions to render a warrantless entry "reasonable." In that case the firemen were deemed to have made a reasonable entry when entering the burning structure to put out the blaze and were permitted to seize the readily observable evidence of arson. Thus the Fourth and Fourteenth Amendments were not violated by the entry of the firemen to extinguish the fire at Tyler's Auction, nor by Chief See's removal of the two plastic containers of flammable liquid found on the floor of one of the showrooms.

Prior to 4:00 a. m. on January 22, however, the firefighters suspected arson and summoned the police whose investigation was not only for the cause of the fire's origin but to determine whether a crime had been committed. Defendants objected to any of the evidence following the time the firefighters and the police detective left the premises about 4:00 a. m., including the entries at 8:00 a. m. and 9:00 a. m. when the Assistant Fire Chief and the Detective returned to the premises, made a detailed inspection but left the building again to obtain tools, then returned and removed parts of the carpet and stairs and continued to search through the rubble. The Court stated that the original exigent circumstance of the fire permitted the entry, noting that the officials charged with extinguishing the fires are also charged with prompt determination of their origin. The Court added that "[i]mmediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and recovery efforts of the victims." l. c. 510, 98 S.Ct. l. c. 1950. The Court then concluded "[o]n the facts of this case, we do not believe that a warrant was necessary for the early morning re-entries on January 22," nor the re-entries at about 8:00 a. m. and 9:00 a. m. for "[u]nder these circumstances, we find that the morning

entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." l. c. 511, 98 S.Ct. l. c. 1951.

Thus the investigation of the building for arson and the taking of pieces of the stairs, carpet and the flammable liquid found in the plastic containers, as well as the search of the building for other evidence of arson, were a continuation of the exigent entry. The right of the officers to return after daylight and continue their investigation sprang from the fact that the exigent quality of the circumstances continued. The Court stated "[i]n determining what constitutes 'a reasonable time to investigate,' appropriate recognition must be given to the exigencies that confront officials serving under those conditions, as well as to individuals reasonable expectations of privacy." The emergency of the fire permitted the entry. The length of time and scope of the search for evidence of possible arson was extended by finding the plastic containers containing the flammable liquid. However, the Court held that the entries occurring *after* January 22 "were clearly detached from the initial exigency and warrantless entry." [2]

In the case sub judice, the urgent circumstances permitting the warrantless entry included possibility of death, illness, or serious injury to persons in the house. After the entry, the exigent quality of the moment was heightened by discovery of the bodies, apparently brutally murdered. The limited superficial search that followed and the removal of the bodies, the taking of photographs of a few scenes in the house and the removal of the few items of personal property not located in the bedroom were within the reasonable time, spatial scope and limited intensity approved by *Tyler*. Thus the absence of a warrant or of consent, as in *Tyler*, did not render the challenged evidence inadmissible and for these reasons defendant's contention is denied.

■ As previously discussed, the bodies, plastic bags and chloroformed socks and venetian blind cord were discovered in the bedroom and admissible under the plain view doctrine and the evidence from the other part of the house (i. e., the gasoline can, chisel, bottle of chloroform and certain of the photographs) were within the scope of the emergency exception to the Fourth Amendment as delineated in *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). We are also convinced that had admission of this latter evidence been deemed improper, such admission would have been non-prejudicial. The evidence of defendant's guilt was strong and certain. Defendant fled the area and despite an intensive search covering several counties, was not apprehended until ten days after the discovery of the crime. We are aware, as stated in *State v. DeGraffenreid*, 477 S.W.2d 57, 65 (Mo.banc 1972) "that error which in a close case might call for a reversal may be disregarded as harmless when the evidence of guilt is strong." See *State v. Davis*, 556 S.W.2d 45

**2.** The United States Supreme Court has recently disapproved Arizona's "murder scene exception" to the reasonable search requirement of the Fourth Amendment in *Mincey v. Arizona*, —— U.S. ——, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), and condemned the admission of evidence taken in an extended four day warrantless search during which a number of police officers proceeded to gather evidence from defendant's apartment. This search followed the warrantless entry and fatal wounding of a narcotics agent and the arrest of defendant in his apartment who was also wounded in the shootout. The officers, after the removal of defendant, the wounded officer and other suspects, proceeded in the four day search. During that period "the entire apartment was searched, photographed and diagramed. The officers opened drawers, closets and cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them for examination. Every item in the apartment was closely examined and inventoried and two or three hundred objects were seized. In short, Mincey's apartment was subjected to an exhaustive and intrusive search." l. c. ——, 98 S.Ct. l. c. 2412. The exigency of the situation could not extend to nor render reasonable such an intensive, long term search. The facts in *Mincey* were clearly distinguishable from those in *Tyler*, or those in the case at bar.

(Mo.banc 1977) and *Thomas v. United States,* 281 F.2d 132 (8th Cir. 1960).

The body of testimony from thirteen State's witnesses occupying almost two hundred transcript pages and some twenty-six exhibits, not including those discovered in Duffner's search, were unrebutted. Defendant offered no evidence. We believe beyond a reasonable doubt the overwhelming weight of the evidence was such that the claimed error, and we find none, could only have been non-prejudicial. The judgment of the trial court is affirmed.

MORGAN, C. J., and BARDGETT, FINCH and DONNELLY, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

SIMEONE, J., not participating because not a member of the Court when cause was submitted.

SEILER, Judge, dissenting.

I respectfully dissent. What the police did here was to break into a man's home. It is true that they did so rather politely, using defendant's father as their arm, and not resorting to a sledge hammer, but the fact remains that they entered a man's home, a cherished and well nigh sacred place to most of us, by force, without first obtaining a search warrant to do so.

This is being justified on the ground it was warranted by an emergency. In my opinion, we are providing a dangerous and alarming precedent here, one which will give the police extremely broad powers and which seriously reduces the protection of the Fourth Amendment against unreasonable searches and seizures. We are developing a new doctrine for the police—the delayed response doctrine or once an emergency, always an emergency, with no need for a search warrant thereafter.

Wiser men than I have pointed out the dangers of relaxing Fourth Amendment standards.

As said in *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948):

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

*See also, Brinegar v. United States,* 338 U.S. 160, 182, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948) (per Jackson, J., dissenting):

"We must remember that the extent of any privilege of search and seizure without warrant which we sustain, the officers interpret and apply themselves and will push to the limit.

". . .

"And we must remember that the authority which we concede to conduct searches and seizures without warrant may be exercised by the most unfit and ruthless officers as well as by the fit and responsible, and resorted to in case of petty misdemeanors as well as in the case of the gravest felonies."

The question before us is not simply whether there was an emergency making reasonable *a* warrantless entry and search of defendant's home. The question is whether *this particular* warrantless entry, search and seizure can be upheld under the emergency doctrine in light of the almost

two and a half hour delay by the officers. The proposed opinion does not address this critical difference between this case and those on which it relies. The latest United States Supreme Court case on the subject states: "[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey v. Arizona,* —— U.S. ——, ——, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978).

Under part I, the opinion discusses the state's contention that the entry was justified under the "need for help" or "emergency" exception, saying the circumstances gave probable cause to believe there was a medical emergency "in which someone might be ill or injured and in need of *immediate help*" (emphasis supplied). Then the opinion refers to the rule of certain cases that whenever the police had reliable information of a death, an emergency exists sufficient to justify an *immediate* search, because apparent death may turn out to be barely surviving life, still to be saved. The opinion points out the odor of decomposing flesh indicated death of at least one person, but there were three persons missing and "one or more could have been in immediate need of help to prevent death." But this justification was not acted on by the police for over two and a half hours. I fail to see how the belated warrantless entry made by the police can be justified as being appropriate under an emergency calling for immediate entry to help someone inside the house in need of immediate assistance.

The exigency of the situation when it first became apparent objectively, whether the police appreciated it or not, that something was seriously wrong inside the Epperson house cannot be extended to, nor render reasonable, in my opinion, a forcible entry made several hours later, during which interval the police could have obtained a search warrant. What we are developing here is a new weapon for the police—the continuing exigency justification, where a delayed entry will be held to relate back to the original emergency, thus obviating the need for a search warrant even though there was ample time in which to obtain one.

Not only does such a doctrine fail to comport with the way reasonable people, including policemen, ordinarily react to emergency "need of help" situations, it means the police can safely delay entry, so far as entering legally is concerned. This is not calculated, in my opinion, to produce prompt action by the police in an emergency and this may delay legitimate investigation.[1]

In *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) there was a lapse of one and a half to two hours between the initial appearance of the police investigator on the scene and the second appearance around 4:00 a. m. Then there was a third entry around 9:00 a. m. All three entries were held valid and a search warrant was not required. But the difference in the cases is that in *Michigan v. Tyler* the first entry was made at the time the emergency arose, while the smoldering embers of the arson were still being extinguished, and the court found that the subsequent warrantless entries mentioned above "were no more than an actual continuation of the first", *Id.* at 511, 98 S.Ct. at 1951, not detached from the initial exigency. In the case at bar there was no entry at the initial exigency. The entry came several hours later, long after the objective indicia first suggested the possibility of death or need for help within the Epperson house.

In *Patrick v. State,* 227 A.2d 486, 489 (Del.Supr.1967), cited as supporting the action of the police, the court speaks in terms of the police duty "to act forthwith upon the report of the emergency", not to miss the chance that "a spark of life remains", as the basis for the emergency situation exception. In the *Patrick* case, the police "immediately entered the premises", *id.* at 488, upon their arrival at the scene. In the

---

1. To illustrate, the search for Epperson did not get under way until in the afternoon, hours after the emergency first came to the attention of the officers. The delay on the part of the police apparently enabled him to get a good head start, because, despite an extensive search, he was not arrested until ten days later, when he voluntarily surrendered.

present case, if there had been a spark of life existing at 9:15 a. m. (which is when the police first learned of the situation) in someone needing immediate aid, it would have died out long before the police finally entered at approximately 11:50 a. m.

*People v. Brooks,* 7 Ill.App.3d 767, 289 N.E.2d 207 (1972), also relied upon and discussed in the proposed opinion, likewise speaks in terms of an emergency which required "immediate action." In the *Brooks* case, the janitor in the apartment building caused the police to be called. When they were going up the stairs to the deceased's apartment they noticed the odor of decomposing flesh. When they got to the front door of the apartment the police opened the door and promptly went in and found the deceased (who had been dead for several days) on the couch in the living room. *Id.* at 210. There was no delay on the part of the police in acting. The *Brooks* case, *id.* at 213, quotes with approval the language of Mr. Justice Burger in *Wayne v. United States,* 115 U.S.App.D.C. 234, 318 F.2d 205, 212 (1963), *cert. denied* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), in which he stresses the duty of the police, when confronted by an emergency, *to act* and the need for swift police response in order to support what would otherwise be an illegal entry.

The facts in *Brooks* are significantly different from the facts in the present case, in which we have no such swift response. The police knew as early as 9:15 to 9:20 a. m. that Mrs. Smith noticed the odor of decomposing flesh in the Epperson house and that her son-in-law was acting suspiciously and that she had reason not to believe his explanations of the whereabouts of her daughter and two grandchildren.[2]

The state in its brief states that "speed was of the essence to bring aid to anyone who needed it . . ." But the police took no action then. Instead, as the facts related in the proposed opinion show, the police tried to figure out some way by which they could induce someone else to break in the house so that the entry would not be charged to them. It was almost noon, two and a half hours later, when the police finally entered the bedroom. If entry to the premises could be delayed this long, obviously there was no immediate need emergency. A true emergency does not invite delayed action. The two are mutually inconsistent.

Someone may say, however, that despite the delay by the police, the need for help and in that sense the emergency, continued throughout the period of delay. But the point is that if so, the justification for dispensing with a search warrant did not, because one could easily have been obtained during that time, as discussed later herein. If the police are confronted with an emergency they should act. If they choose to delay, then they should obtain a search warrant. They should not be permitted both to delay and to dispense with a search warrant. That is not what is called for by the Fourth Amendment.

Under part II, the opinion takes up the matter of objective standards, quoting from *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) about whether the facts available at the moment of the search would warrant a man of reasonable caution in believing what was done was appropriate. The moment of search here was shortly before noon, over two and a half hours after the officer had reason to believe there was a dead body in the house and that three people were missing. I do not believe a reasonable man would consider it was appropriate to wait two and a half hours and then enter the premises to see if there might be someone inside alive and in need of help.

The opinion then, still under part II, says that what the officers were doing was in good faith searching for persons missing under unusual circumstances. I agree.

2. One analyzing the facts of this case finds himself returning again and again to the fact that Mrs. Smith noticed the odor of death—decomposing human flesh—in the Epperson

house. It was this fact that made it apparent that something was very, very wrong in the Epperson house, as she made clear to the police in her initial report.

But a search for missing persons, while a serious matter,[3] is not per se an emergency of the kind under discussion, nor did the police consider it such, as shown by the unhurried way in which they went about it.

The opinion states that the validity of the search must be judged on objective reasonableness, but then quotes Sgt. Duffner's subjective thoughts "as far as [he] was concerned" that he really didn't know what he had, that he was just looking to see "if they had skipped the country or they were injured or what." There is no testimony in the record that Sgt. Duffner ever expressed these thoughts to anyone. In fact, he testified he did not think anyone was in the house, that he was not alarmed, but was extremely curious. The record shows that Duffner consulted several times during the morning with the chief of police, Chief Bolli, as well as with Officer Schindler. Chief Bolli told them the police were not to break in the house. Much of the police discussion related to the possibility of getting defendant's father to do the breaking in. There is no mention (except for Duffner's thought to himself) of there being any need to break in because someone inside needed help and quickly.

As the proposed opinion states, the general rule is that an entry and search without a warrant is unreasonable and the burden is on the state to show an exception exists. The state has failed to do so. The "need for help" or "emergency" justification comes from the state as an afterthought to justify a belated entry. The officers were curious about what had happened to Epperson, his wife, and children. They wanted to enter the house to investigate, not to try to give first aid to someone who might be in dire circumstances.

Defendant's motion to suppress the evidence discovered and seized after the unlawful entry should have been sustained. It is true this would result in a reversal and a new trial for a defendant who no doubt is guilty as charged. But we cannot disregard the Fourth Amendment in cases where to do so will benefit the defendant. Having seen fit not to act promptly upon the information furnished by Mrs. Smith, the police should have obtained a search warrant and entered the house legally. They could easily have done so. It was a weekday, Wednesday. The court house is located in Mexico. The magistrate, the circuit judge, and the prosecutor were close at hand. The police had control of the situation at the house because they were watching and standing guard over it. There was no need for them to break into defendant's home two and one half hours later. They were in possession of facts which they should have presented to a neutral magistrate for his determination as to whether there was probable cause that a crime had been committed and that a search of the house was warranted. It is noteworthy that no suggestion is made by the state that a search warrant could not easily and conveniently have been obtained.

The recent *Mincey* decision, mentioned earlier, states: "There was no indication that evidence would be lost, destroyed or removed during the time required to obtain a search warrant. Indeed, the police guard at the apartment minimized that probability. And there is no suggestion that a search warrant could not easily and conveniently have been obtained." *Id.* at ——, 98 S.Ct. at 2415. *See, also United States v. Donovan*, 429 U.S. 413, 436 n. 24, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), as follows: "Although law enforcement officials can often take action without a warrant when they have been unable to foresee the circumstances that eventually confronted them, they still must obtain a search warrant when their prior knowledge is sufficient to establish probable cause . . . ." Here there can be no doubt that for a considerable period of time prior to their breaking into the house, the police officers had sufficient knowledge to establish probable cause.

---

**3.** In *Mincey v. Arizona, supra*, —— U.S. at ——, 98 S.Ct. at 2410, the court declined "to hold that the seriousness of the offense under investigation [there murder, assault and narcot- ics] itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search."

*See also Vale v. Louisiana*, 399 U.S. 30, 34–35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), as quoted with approval in *Mincey v. Arizona, supra.*

It is our duty to uphold defendant's constitutional rights under the Fourth Amendment, whether or not he is guilty. If we do not enforce the Fourth Amendment, no one will. Here defendant's counsel carefully and properly raised the constitutional question and has preserved it throughout. The motion to suppress should have been sustained. I therefore respectfully dissent.